[Crim. No. 2486.   Third Dist.   Feb. 2, 1954.]

THE PEOPLE, Respondent, v. LEO C. LAYA, Appellant.

Robert R. Harlan for Appellant.

Edmund G. Brown, Attorney General, and Gail A. Strader, Deputy Attorney General, for Respondent.

PAULSEN, J. pro tem.*—Appellant was charged by indictment with the murder of John Camalig and with two counts of assault with a deadly weapon with intent to commit murder. He interposed pleas of not guilty to each count, but was found guilty of murder of the first degree and of an assault upon Suzie Camalig with a deadly weapon with intent to commit murder and of the lesser offense of an assault upon Mary Camalig with a deadly weapon. The jury fixed the punishment on the count of murder at life imprisonment. After denial of appellant's motion for a new trial, judgment was pronounced and he was sentenced to life imprisonment in San Quentin as the penalty for the murder of which he

---

*Assigned by Chairman of Judicial Council.

was convicted and to serve the terms prescribed by law for assault with a deadly weapon and for assault with a deadly weapon with intent to commit murder.

Appellant urges that the evidence was insufficient to sustain a conviction of: 1. Murder in the first degree, or 2. Assault with a deadly weapon upon Suzie Camalig with intent to commit murder, or, 3. Any assault upon Mary Camalig. He complains of misconduct upon the part of the district attorney and declares that the court was in error in the giving of two instructions requested by the People.

The appellant is a Filipino of about 40 years of age. He met the Camalig family in the late spring of 1951 and fell in love with their 16-year-old daughter Suzie. Appellant was then in the merchant marine and he and Suzie corresponded until his return to Sacramento in June, 1952. During that time he sent Suzie and her family presents from various parts of the world. He also gave Suzie two certificates evidencing the fact that he had crossed the Equator and the Arctic Circle. These certificates were highly valued by the appellant and he testified that he felt that if Suzie kept them it would mean she was going to accept his proposal of marriage, but that if she returned them it would indicate her rejection of his suit.

Early in the evening of January 18, 1953, appellant called at the Camalig family residence and visited with Suzie and her parents, particularly with her deceased father, John Camalig. Appellant displayed no animosity toward anyone at that time and it appeared that he was merely making his usual social call. The evidence makes it clear, however, that both Suzie and the members of her family were opposed to the continuance of the courtship, and appellant was well aware of their attitude. He testified that in order to determine what Suzie's feelings were toward him, he asked her that evening for the return of his certificates and that she professed to have lost them or to be unable to find them. Notwithstanding the fact that appellant was in the living room, Suzie excused herself and went to bed about 8 o'clock, leaving him with the father and mother. Shortly thereafter Mrs. Camalig retired and appellant visited with the father until about 9 p. m.

Appellant then left the house and, according to the testimony of Mrs. Camalig, Mr. Camalig went to bed and the house was in darkness. There were three bedrooms in the house, each with a door opening upon the living room and

Suzie occupied a bedroom adjoining that of her father and mother.

After leaving the Camalig home appellant went to a movie but remained only a short time as he felt "restless" and was upset at his failure to get Suzie to commit herself definitely. About 11 o'clock that night he returned to the Camalig neighborhood, but instead of driving to the house, as he had done earlier in the evening, he parked the car about 1,000 feet from the Camalig house. Appellant admits that before he left the car he wrote the following note:

"18 January 1953.

"To All Concerned:

"Whatever else happens is of mutual understanding between Susie and me. It is also a lesson for parents not to play the trade of suckers. Had it not been for the ill will and wilful disregard of Susie's father, Apo Segundo Camalig, the essence of sacred matrimony must have been realized or materialized. This is the best which Susie and I could possibly do."

Signed: "Leo and Susie."

That morning appellant had removed a Mauser automatic pistol from a trunk in which he had kept it for many years and placed it in his car. After writing the note, appellant took the gun and a flashlight and proceeded on foot to the Camalig home.

There is a sharp conflict in the evidence as to the manner in which the crimes were committed. Appellant testified that because of Suzie's attitude toward him and his belief that she would not marry him he determined to visit her and give her an opportunity to shoot him. He stated that on at least one prior occasion she had said that she might shoot him sometime. He further stated that he wrote the note with that thought in mind and placed it in his pocket so that it would be found after his death as he did not expect to live any longer. Appellant testified that when he entered the house a light was on in the living room; that John Camalig was in the room partially dressed; that he requested John's permission to talk to Suzie; that after a short argument John struck him upon the head and the shots were fired while John was advancing upon him; that he did not know Suzie had been hit until he heard her call out that she had been shot.

There was abundant evidence to support the implied finding of the jury that the defendant's story was false in most

particulars; that all members of the family were in bed and that the house was in total darkness as he stealthily approached it. Suzie testified that she was sound asleep and was awakened by the beams of a flashlight; that she jumped out of bed and saw a man propping open her bedroom door. She recognized the appellant at the time and "screamed" to her father to come; that, without saying a word, and while only 3 feet away, appellant shot her in the abdomen; that immediately after the shot was fired she heard her father "screaming" from the living room and appellant turned and started toward her father. Suzie lay down on the bed and heard a brief scuffle and three shots fired in the living room.

Mrs. Camalig testified that she was awakened by the sound of shots and a struggle in the living room. She got out of bed, turned on the lights and went out into the living room where she observed appellant on the front porch and her husband near the door of the front porch. Appellant was holding a gun in his hand which he raised and pointed at her and she heard it click twice, but the gun failed to fire. Appellant then went out the screen door of the porch and John Camalig fell to the floor. Mrs. Camalig helped her husband back into the living room and into a chair. She then ran out the back door, awakened her son and Felipe Pascual, a boarder, and then ran back to the house and to her husband. At this time appellant returned by way of the front door. Mrs. Camalig faced him and kept backing up while appellant advanced into Suzie's room until the two reached the middle of the bedroom and just as appellant started to raise the pistol from his side Mrs. Camalig and Felipe seized him and during the struggle Mrs. Camalig was shot and slightly wounded. She and Felipe succeeded in taking the gun away from him and subduing him. At this time it was noticed that appellant was in his stocking feet.

Sheriff's officers were called and appellant was placed under arrest. The injured persons were removed to the hospital where John Camalig died the next day. The autopsy showed that he had been shot three times, once in the right forearm and twice in the back.

The questions as to whether the evidence was sufficient to establish an intent to murder Suzie and whether there was premeditation and deliberation in the killing of John are so closely related that the two may be considered together.

It seems clear that appellant realized in the early morning of the day of the killing that matters were coming to a head at the Camalig home when he removed his gun from the trunk and put it into his car. His own testimony shows that he was dissatisfied with the actions of Suzie and that he had a slight argument with John Camalig before leaving the house that night. There was abundant evidence to indicate that the day was devoted to planning and to consideration of his problem. The use of the flashlight, the removal of his shoes and the manner of his approach to the house, all have a strong tendency to show a determination to kill and premeditation in determining the plan of his attacks. It is contended that the note is too vague to afford any definite indication of his intentions; but with this we cannot agree. Appellant's statement that he wanted it to be found on him after Suzie shot him was not binding upon the jury. The first and last sentences of the note and the fact that it was purportedly signed by appellant and Suzie, although she could not possibly have signed it, suggest strongly that appellant planned to kill both Suzie and himself and that he hoped the note would lead those who found the bodies to the conclusion that there had been a suicide pact. The remainder of the note evidences a strong conviction upon the part of appellant that the parents, and particularly Suzie's father, were responsible for the failure of his marriage plans. The further fact that appellant said nothing when Suzie jumped out of bed and immediately shot her, negatives the idea that he intended to give her the chance to kill him.

It is argued that if appellant had intended to kill either Suzie or her father he would not have stopped shooting after wounding them. The jury could well have concluded that he would have finished the killing in each case if he had not been interrupted and prevented from doing so. After he wounded Suzie he was interrupted by the arrival of her father in the room behind him. Immediately after firing three shots and seriously wounding John Camalig he was interrupted by Mrs. Camalig and he could well have believed that Suzie and John were both fatally wounded, especially after he saw John drop to the floor of the porch. Further, the jury was entitled to consider the fact that he reentered the house and with his gun still in his hand advanced to Suzie's bedroom with her mother retreating before him and was only prevented from doing further harm by the fact that he was subdued.

"Generally the determination of the degree of the crime is left to the discretion of the jury." (*People* v. *Tubby,* 34 Cal.2d 72, 76 [207 P.2d 51].)

It was stated in *People* v. *Daugherty,* 40 Cal.2d 876, 884 [256 P.2d 911]:

". . . the rule that where evidence is open to two equally reasonable constructions, one of which points to the guilt of defendant of a higher degree of crime, and the other to his guilt of a lesser degree, the court must adopt the theory pointing to guilt of the lesser degree, is not a correct statement of law when applied to the consideration of a case by an appellate court. That rule applies to the trier of fact only, be it jury or trial court, the same as does section 1096 which deals with reasonable doubt. . . ."

And the appellate court may not: "reduce the degree of the crime unless the evidence is legally insufficient to support the higher degree of which defendant was convicted, and in determining that question, the evidence, even if circumstantial, is not weighed."

In *People* v. *Holt,* 25 Cal.2d 59, 70 [153 P.2d 21], it was stated: "The function of the jury was to appraise the weight of the evidence; ours is to appraise its legal adequacy; . . ."

The circumstances narrated clearly indicate that appellant, prior to entering the house in the commission of the murder and assault, must have deliberated, thought over and considered his actions. The existence of these elements make the offense murder in the first degree. (*People* v. *Gilliam,* 39 Cal.2d 235 [246 P.2d 31]; *People* v. *Isby,* 30 Cal.2d 879 [186 P.2d 405].) We are satisfied that the evidence is legally sufficient to support the findings of deliberation and premeditation in the murder case and of an intent to kill in the assault upon Suzie.

Appellant has cited a number of cases in which the Supreme Court has reduced judgments of murder in the first degree to murder in the second degree, but the facts in those cases are so dissimilar to the facts in the instant case that it is not necessary to discuss them or to distinguish them.

There is still another ground upon which the conviction of first degree murder must be sustained. Section 189 of the Penal Code provides in part:

"All murder . . . which is committed in the perpetration or attempt to perpetrate . . . burglary . . . is murder of the first degree . . ."

The statute defining burglary provides in part as follows: "Every person who enters any house . . . with intent to commit grand or petit larceny *or any felony* is guilty of burglary." (Pen. Code, § 459.) (Emphasis added.)

The facts in the instant case, as outlined above, show that appellant entered the house with intent to commit a felony and that he did, in fact, commit a felony consisting of assault with a deadly weapon upon Suzie Camalig. There was ample evidence, if the jury believed that appellant entered with the idea of assaulting Suzie, to support a finding of burglary on that ground (*People* v. *Miller*, 121 Cal. 343 [53 P. 816]), or, if it accepted appellant's story that he intended to persuade Suzie to kill him, that in itself would have justified the same finding. "Every person who deliberately aids, or advises, or encourages another to commit suicide, is guilty of a felony." (Pen. Code. § 401.) And it is equally clear that if he had advised and encouraged Suzie to kill him he would have been guilty of a felony in so doing. (Pen. Code, § 31.)

The contention that the evidence was insufficient to support the conviction of assault with a deadly weapon against Mrs. Camalig as charged in count II of the indictment is also without merit. The basis of this argument is that Mrs. Camalig was shot during a struggle between herself and the appellant.

Mrs. Camalig testified that when the appellant first came into the room his hands were down at his sides and that she did not notice the gun, but that he then raised the gun as if to point it and it was at this time she attempted to take it from him. A few minutes previously appellant had pointed the gun at her and attempted to fire it twice.

Appellant states that Mrs. Camalig was shot when she grabbed the gun. Mrs. Camalig did not so testify. Her testimony on this point is that she grabbed him and that during the ensuing struggle the gun went off.

Specific intent is not necessary for a conviction of the crime of assault with a deadly weapon. (*People* v. *Griffin*, 90 Cal.App.2d 116 [202 P.2d 573]; *People* v. *Mendez*, 67 Cal.App. 724 [228 P. 349]; *People* v. *Lim Dum Dong*, 26 Cal. App.2d 135 [78 P.2d 1026]; *People* v. *Walker*, 99 Cal. App.2d 238 [221 P.2d 287].)

The assault with a deadly weapon had been completed in this case prior to the firing of the shot which struck Mrs. Camalig. A battery or a wounding constitutes no part of the statutory offense of assault with a deadly weapon.

16

■ The mere pointing of a gun at a victim constitutes an assault with a deadly weapon, whether or not it is fired at all. (*People* v. *Thompson*, 93 Cal.App.2d 780 [209 P.2d 819], and cases therein cited.)

■ Appellant points out three instances in which he contends the district attorney committed reversible error by making statements in the presence of the jury which tended to prejudice him. In the first of these the district attorney stated in making an objection that the evidence being elicited by the defense was self-serving and immaterial and was being produced merely for the purpose of creating sympathy. The trial court sustained an objection and instructed the jury to disregard the statement. Later, the district attorney, in making an objection on the ground that the defendant's answer was not responsive to the question, stated that the witness was injecting something not responsive to the question and further said "he just keeps jamming in something that doesn't have anything to do with the question." An objection was again sustained, the remark stricken and the jury properly admonished. Again during the cross-examination of defendant with respect to his testimony that it was his intention to give the gun to Suzie Camalig and ask her to shoot him, the district attorney asked, "Why couldn't you have done that job yourself if you wanted that done?" An objection to this was sustained. An examination of the record shows that the defendant while testifying attempted repeatedly, when answering questions, to make unresponsive statements and to discuss the reason for his actions and the state of his feelings at the time. Considered in their context, it is clear that the district attorney was trying to prevent him from making such unresponsive statements before an objection could be made. The conduct was of such a trivial nature that in view of the court's prompt action it could not have been prejudicial under the circumstances of the case.

■ Complaint is made to the effect that the giving of "Instruction No. 20" was error because it did not tell the jury that they should return a verdict of a lesser offense "if a reasonable doubt exists as to whether a specific preconceived intent to kill existed." The appellant does not refer to the transcript to identify the instruction and we have been unable to do so. In any event, the court fully instructed on the subject of burden of proof beyond a reasonable doubt and the subject matter was properly covered.

■ Finally, it is argued that the giving of Instruction

No. 18 was erroneous. The basis of this contention is that certain language of the instruction implies that as a matter of fact an assault with a deadly weapon did take place. The instruction reads:

"A deadly weapon is any object, instrument or weapon which, *if* used in the manner in which it appears to have been used, is capable of producing, and is likely to produce, death or great bodily injury." (Emphasis added.)

Appellant's position is that the phrase "which, if used in the manner in which it appears to have been used," suggests that the appellant used the weapon in a particular manner.

This instruction, without the word "if" was given in *People* v. *Simpson,* 87 Cal.App.2d 359 [196 P.2d 933], and *People* v. *Butler,* 118 Cal.App.2d 16 [257 P.2d 109], and in those cases was held to be erroneous because there was a sharp conflict in the evidence concerning the use of the weapons at all. In this case appellant admitted the ownership of the pistol and the shooting in each instance, his only contention being on this appeal that when Mrs. Camalig was shot it resulted accidentally and during the struggle for its possession. In order to remove any uncertainty the court inserted the word "if" so that the jury could not misconstrue it. In our opinion, it was not erroneous as given in this case. In any event, in view of all the circumstances, we are constrained to hold that, under section 4½ of article VI of the Constitution, the giving of the instruction did not result in a miscarriage of justice.

The judgment and the order are affirmed.

Peek, J., and Schottky, J., concurred.