[Crim. No. 6685. In Bank. May 25, 1961.]

THE PEOPLE, Respondent, v. RAYMOND MARTY HAMILTON, Appellant.

Martin N. Pulich, Public Defender, John D. Nunes, Chief Assistant Public Defender, and Chris G. Gasparich, Assistant Public Defender, for Appellant.

Stanley Mosk, Attorney General, Albert W. Harris, Jr., and Arlo E. Smith, Deputy Attorneys General, for Respondent.

PETERS, J.—Raymond Marty Hamilton was charged with the murders of Estella Hamilton and Lorenzo Bernard. The jury found him guilty of both crimes, fixed the degree of the murders as first, and, as to each count, fixed the penalty at death. Motions were made to reduce the degree of the crimes,

to reduce the penalty imposed, and for a new trial. Defendant appeals from the judgment and from the orders denying his several motions.

The evidence is conflicting. The prosecution produced substantial evidence to show that the killings were of the first degree in that they either were "wilful, deliberate, and premeditated" (Pen. Code, § 189), or were committed in the perpetration of a burglary. On the other hand the defendant produced evidence to the effect that he did not enter the house where the two victims were killed with intent to commit a felony, and that the killings were, at most, of the second degree. It is, therefore, necessary to determine whether any errors were committed during the trial, and, if so, whether such errors were prejudicial. It is our opinion that the trial court erroneously admitted, over objection, certain evidence, and that those errors were so serious as to have deprived defendant of the fair trial guaranteed to him by the Constitution. They were, therefore, prejudicial.

Estella Hamilton and the defendant met and married in 1950. The marriage was not stable, being characterized by alternate periods of separation and reconciliation. Prior to the marriage defendant had been convicted of several felonies, including robbery, grand theft, car theft, and possession of a weapon by a felon in the state prison. In 1950, while on parole, he married Estella. Shortly thereafter he was returned to prison as a parole violator and remained there until June of 1954. Upon his release he lived in Berkeley with Estella and her mother for about three months, when Estella left and went to Texas. She returned to Berkeley in February of 1955. In December of 1954 or January of 1955, defendant had met Verna Baldwin and had commenced to live with her. After Estella's return, she and the defendant met frequently, but they did not live together. In March 1955, Estella went to Texas, and did not return until August or September of that same year. The Hamiltons then decided on a divorce, which Estella obtained in Texas by default on the grounds of cruelty in January 1956. Their child was born in Texas after the divorce.

When Estella returned to Berkeley in September of 1956, she and the defendant began seeing each other again. Estella again became pregnant by him, but this child was prematurely born and died in April of 1957. In October of 1957 defendant was returned to prison for violation of parole and remained

there for 11 months. While in prison he was frequently visited by Estella who represented herself to the prison authorities as defendant's wife. Following his release, the two attempted a reconciliation but they "couldn't make a go of it," and defendant left Estella in October of 1958. Thereafter, he went to live with Verna Baldwin again but continued to see Estella.

During this general period defendant testified that he and Estella had had several arguments over attentions paid to her by another man. On one such occasion defendant was arrested for disturbing the peace after he and Estella got into an altercation when she showed him a picture of herself with this other man.

During this same period defendant had several disputes with Lorenzo Bernard. He testified that prior to May 1959, on several occasions, he had seen Estella in Bernard's company, and on one such occasion, had had an argument with Bernard when he found Estella and Bernard in her home scantily dressed in the presence of the child. On another occasion defendant visited Estella although Bernard was present, and invited her to go to San Francisco with him. She accepted, and they "got kind of sentimental," and went to a hotel and had sexual relations. He then took her back to her home, where Bernard was waiting. The next day, April 22, defendant met Estella at the Berkeley Health Clinic where she had an appointment in connection with prolonged and irregular vaginal bleeding from which she had suffered for a long time. On May 4th or 5th, he visited her at Highland Hospital before she underwent surgery. At that time, according to the defendant, Estella informed him that she had been charged in Berkeley with carrying a pistol concealed in her purse. The offense was committed on April 30, 1959. Defendant testified that she asked him to help her by telling the Berkeley authorities that they had had an argument, thereby giving her a reason for carrying the weapon.

Early in May of 1959, defendant was involved in another altercation with Lorenzo Bernard at the California Hotel in Berkeley. He testified that he had previously given money to Bernard to pay to a bail bondsman by whom Bernard was employed. He met Bernard at the hotel and took a ride with him during which they had a dispute about the money. Defendant testified that Bernard pulled out "something like a knife," and defendant got out of the car and went back to the hotel. When Bernard came in later, defendant apologized

to him and Bernard said ''just get out of my way.'' He had a knife in his hand. A friend of the defendant pulled the defendant into an adjoining coffee shop.

Shortly thereafter the defendant left Berkeley, and on May 18th arrived at the home of his sister in Los Angeles. On May 19th, he received a telephone call from Verna Baldwin. She informed him that Inspector Bishop of the Berkeley Police Department had been to her apartment and had told her that he wanted the defendant to be in Berkeley Municipal Court on May 22nd in regard to Estella's gun incident. On May 20th, the defendant telephoned Estella at her place of employment in Berkeley. Estella told him that she wanted him to be in court when she was sentenced; that she was afraid that she might have to go to jail on the charge unless the defendant made an appearance; and that she would meet him that evening at her home in Berkeley. The defendant agreed to be there. He arrived in San Francisco about 8 p. m. and drove to Oakland with some people he had met at the airport. From the apartment in Oakland where he and Verna Baldwin had been living, he called Estella at her home and told her that he had been delayed. She told him to come to the house, but not to be ''too late.'' Defendant walked a considerable distance to where Verna Baldwin was working in order to get the automobile he and she were buying. He asked Verna if she could come out to Estella's house with him and act as a witness, but Verna could not get off duty.

He testified that he had difficulty in getting the car to start, and that he stopped at a pay telephone booth and called Estella again. Estella's attitude had changed. She told him that he should have been there earlier and that ''it was no sense for him to come'' at that late hour. Defendant, however, decided to go to Estella's house in order to get the matter ''straightened out once and for all.'' From the tone of Estella's conversation the defendant believed that Bernard probably was at the house, and that there might be trouble. He stated that he determined to take a witness with him to ''keep down the confusion.'' He drove to the apartment of Miss Letha Sheppard. She testified that when the defendant arrived he did not appear to be upset or excited. He told her that he wanted to talk with Mrs. Hamilton and possibly induce her to come back to Miss Sheppard's house with them. He asked Miss Sheppard to go with him to Estella's and also asked her to induce Estella to talk to them by making inquiries about the renting of an apartment, since Estella at that time was em-

ployed in that business. He offered to cancel a $40 debt Miss Sheppard owed him if she would agree, which she did.

On the way to Berkeley, defendant stopped at Verna Baldwin's apartment. When he returned to the automobile, he showed Miss Sheppard a gun which he had taken at some earlier time from his brother's house in Los Angeles for the avowed purpose of fixing the broken spring on the safety. He told Miss Sheppard that he had brought the gun with him because he feared that Bernard might be out at Estella's house and he wanted the weapon for a bluff if Bernard should start any trouble.

The defendant parked the car around the corner from Estella's house. He and Miss Sheppard walked up to the front porch and rang the doorbell. Estella came to the door and looked out the glass windowpane. Miss Sheppard asked her if she would open the door so that she could talk to her about renting an apartment. Defendant stood to one side, out of Estella's vision, and said nothing. Estella refused to open the door and told Miss Sheppard to contact her the next morning. Defendant and Miss Sheppard then left the porch and started down the stairs. Miss Sheppard walked directly back to the parked vehicle. What thereafter occurred was witnessed only by the defendant, Estella and Bernard. The defendant states that he started to follow Miss Sheppard but looking back, saw Estella peeking out the front window. He then walked around the side of the house and went up on the back porch, which was located outside the kitchen and the bedroom. He knocked on the kitchen door and Estella asked him to come to the bedroom window. At the window he "stooped down" and had a conversation with her. She told him that he should have come earlier and that now it was too late. He told her that he could explain if she would just allow him to talk to her. However, she did not reply and walked away from the window. According to defendant he was "pretty frustrated and upset" because he had made the long trip from Los Angeles and now was refused admittance, so he kicked in the window. He then decided to go into the house and stepped in through the broken window. His gun was then in his pocket. He denied intending to harm anyone. He claims that immediately upon entering the bedroom he was struck on the head with "something," and was stunned and confused. He was wearing a hat when he entered. When hit he fell to his knees, got up on his feet and saw Estella and Bernard. The only light in the house was a single candle

burning in the bedroom. Bernard started towards him and defendant ran to the kitchen and tried to get out, but the back door was locked. Bernard followed him and attacked him with a knife, cutting him. He then pulled the gun, pointed it at Bernard, and told him to get back. He fired the gun at Bernard in the kitchen, probably more than once. Then he ran back into the bedroom to a point near the broken window. Estella was between him and Bernard. She grabbed at his arm, trying to pull the gun down, and it discharged, and Estella slumped to the floor. Then defendant fired the gun again at Bernard, who ran back into the dark kitchen. Defendant says he heard a "knife or something dropping" when Bernard ran back. Then, he claims, wanting to take Estella to the hospital, he put her head out the broken window, but she kept slipping back. In order to get out of the window himself without cutting his clothes, he rested his knee on her body. Remembering his hat after he was halfway out the window, he came back in the bedroom looking for it. He did not find it, but did see a knife which he picked up, and which was later in his possession when he was arrested. Going outside of the house, again over Estella's body, he attempted to pull Estella out from the outside. He was trying to lift her but "she was hung up on the window." There was a lot of blood. He became scared and ran. He claims that he put the gun to his head on the back porch and pulled the trigger, but nothing happened. He ran back to the car where Letha Sheppard was waiting.

Miss Sheppard testified that when defendant ran up to the car he appeared to be hysterical. He stated to her that he "had to shoot the broad," but that it was an accident, and had also "shot the guy too because he jumped me." Defendant drove in a fast and erratic manner, and Letha got out of the car on the Nimitz Freeway while the vehicle was in motion. Defendant then drove to Lodi and from there to Stockton where he was apprehended the next day.

Certain other evidence was introduced in regard to the commission of the homicides. Mr. Joseph Labarile testified that he lived in a house situated on adjoining property about 15 feet from Estella's house. On the evening of May 20th at about 10:30 p. m. he heard the breaking of glass followed almost immediately by one shot, then a pause when he heard a woman scream, and then a succession of shots.

Mr. Clarence Burkes testified that he also lived next door to Estella. On the night of the shooting he heard first what

sounded like the breaking of glass and then three shots in rapid succession. Mr. Burkes gave conflicting testimony as to the elapsed time between the breaking of the glass and the firing of the last shot but finally testified that the interval was about four and one-half seconds.

The police officers who arrived at the scene after the shooting found the doors to the house locked. The body of Estella was lying on the bedroom window with a deep laceration across her neck. The electric lights were off in the house, but a candle was burning in the bedroom. Lorenzo Bernard was lying on the kitchen floor near the door to the bedroom. He was clad only in a pair of shorts, and appeared to be wounded. There were blood spots in various parts of the bedroom and kitchen, and there was broken glass in the bedroom, as well as outside the window. Four expended casings were found in the kitchen, one in the bedroom and one just outside the bedroom window.

The autopsy surgeon testified that the cause of death of Lorenzo Bernard was a gunshot wound in the pelvis. He also had a gunshot wound in his back close to the right shoulder blade. The autopsy surgeon also testified that the cause of Estella's death was a combination of a gunshot wound and the laceration of her neck.

After the defense had rested, the prosecution, over defense objections, introduced numerous declarations claimed to have been made by Estella to many persons, most of whom were law enforcement officials, to the effect that not only was she afraid of defendant but that he had threatened her with death on many occasions, had beaten her and had forced his attentions on her against her will. These declarations dealt for the most part with past conduct, that is, with past completed acts, and were not simply threats as to future conduct. Moreover, many of them related to defendant's ''state of mind'' rather than to that of Estella. But all of these hearsay declarations were admitted to show the ''state of mind'' of Estella, and not for the purpose of proving the truth of the charges. The trial judge ruled that ''state of mind'' was in issue because the defendant had put it in issue by his testimony that he and Estella were friendly, and that she had invited him to her home the night that she was killed. These declarations were admitted, ostensibly to show that Estella was not friendly with defendant, and that her ''state of mind'' was such as to cast doubt on defendant's testimony.

After the trial judge had ruled that such declarations were

admissible, he then, and several times thereafter, carefully pointed out to the jury that the evidence was being admitted for the limited purpose of showing the declarant's state of mind, and that the jury was not to consider it for any other purpose. In the instructions to the jury the court again restated these principles.

It should also be pointed out that, after the prosecution had offered this evidence, the trial court permitted defendant to testify that many of the events described in the declarations had, in fact, not occurred.

Defendant argues that in spite of the iteration and reiteration by the trial judge of the limited purpose for which the evidence was admitted, and the limiting instructions to that effect, it was error, and prejudicial error, to have admitted this evidence. This is so because, he asserts, it was an impossible mental feat for the jury to separate "state of mind" from the truth of the charges. Because many of these declarations dealt with claimed past conduct on the part of deceased, defendant, so it is asserted, was placed in the impossible position of attempting to show that Estella's declarations did not reflect her true state of mind. This he could do only by offering testimony to rebut the truth of the assertions made in such declarations. Thus the truth or falsity of the asserted facts contained in such declarations was inevitably placed in issue. We agree with these contentions. We are of the opinion that the declarations, insofar as they referred to past conduct of defendant, and insofar as they purported to reflect defendant's, rather than Estella's state of mind, were inadmissible. We are also of the opinion that, even as to those few declarations that were admissible, the trial court abused its discretion in permitting the prosecution to introduce the cumulative testimony of nine witnesses on this issue.

A brief reference to the content of the declarations will be helpful. As will be seen from this résumé (the actual testimony on this matter covers 110 pages of the transcript), nine separate witnesses, most of them law enforcement officials, were permitted to testify at length and in detail as to these hearsay declarations. Much of this evidence was cumulative.

Inspector Bishop of the Berkeley police identified certain pages of a diary kept by Estella and found in her bedroom after her death. Those pages of the diary were then read to the jury by the prosecutor. The dates of those entries are important. Estella was killed on May 20, 1959. The entries read to the jury all were made in the month prior to May 20th.

Entries as of April 21, 22, and May 6, were read to the jury. Under date of April 21, the diary states that Hamilton came to Estella's house; that at first she refused to open the door; that he then offered her some money for their child and she opened the door; that he then "grabbed me, forced his way in, ran off my friends, and took me to San Francisco." Under date of April 22, the diary states that Hamilton met her when she came out of a doctor's office and "forced me to get in his car, took me to a friend's house, threatened to put a needle in my arm, forced me to accept him, slapped me, and threatened to kill me and family, then cried and said how much he loved me." As of May 6th the diary states that while Estella was in the hospital being prepared for surgery Hamilton forced his way in to the room and told her that he was "going to kill everyone, my mother, stepfather, Mr. Bernard. He told me how easy it would be to kill me and be in China before the police would catch him."

It should be noted that all of these diary entries dealt with past conduct on the part of Hamilton, and were relevant mainly as to the state of mind of defendant rather than to that of Estella. Some of these statements, as well as most of those referred to below, were made after Estella had been charged with illegally carrying a gun, and was seeking probation. Under such circumstances there were not any reasonable safeguards that tended to show probable reliability for such statements. They are of doubtful trustworthiness, and, as will be pointed out later, for that and other reasons should have been excluded.

Inspector Bishop also testified to certain conversations he had with Estella in 1958 and 1959. The officer stated that Estella asked for police help in keeping defendant away from her, and stated that defendant was continually coming to her house against her wishes "and forcing himself on her sexually" and would threaten her with bodily harm, and "[s]he stated that she was very much afraid" of defendant "because he would probably kill her." The officer also testified that she said that defendant "had again threatened her with bodily harm, and she was afraid of him." Again, "She was asked or explained that she had been carrying a gun because she was in fear of her life, that Ray Hamilton would kill her on the street if he saw her. . . . She went on to relate a whole series of incidents and troubles of his forcing himself into the house and forcing her to go with him allegedly at knifepoint to San Francisco. . . ."

Elda Whaley of the Berkeley police testified that on April 30, 1959, she had a conversation with Estella, and that Estella had told her that she had been bleeding vaginally for 32 days; that defendant "was responsible for the bleeding, when he called at her home repeatedly and unexpectedly and at that time would beat her with his fist in the abdomen. . . . She said that he had threatened to kill her, that she knew he would kill her, and that was the reason she was carrying the gun."

Herbert Rounds, also of the Berkeley police, testified that in 1958 Estella told him that she "was very much afraid of her ex-husband Raymond Hamilton. She said that he had called her at all times of the day and night and that he had threatened to kill her."

The mother of Estella, Fanny Smith, was permitted to testify as to various conversations with her daughter in which Estella stated that defendant "many" times had threatened her; that on May 13th Estella told her that at the hospital defendant had threatened to kill her, her mother, her mother's husband and the baby. Estella is also supposed to have told her mother that while she was in the hospital defendant created a disturbance, got into her room by a ruse, and "punched her in the stomach" telling her that "he could kill her then and could be in China before anybody knew what had happened."

On another occasion Estella phoned and asked her mother to take care of the baby because she was going to San Francisco and stay "because Raymond wants to kill me." On that occasion Estella made arrangements to meet her mother at a certain hamburger stand, and told her "I had to flee the house. Ray came over and raise sand with me, pushed me around, twisted my arm and everything . . . he got mad. And he started boxing me around. And then he left to go and get his gun, said he was coming back to kill me." Estella also said she was afraid of staying in her own home because of her fear of Hamilton; that on one night Hamilton forced her into his car, drove her to San Francisco and tried to secure from friends a hypodermic needle; that he told "her that he was going to make a tramp of her, if it was the last thing he did. . . . [Then] he forced her . . . to have an intercourse with him in the car"; that she kept her shades down because of fear of Hamilton; and that she "told me that Raymond [Hamilton] struck her; he twisted her arm; knocked her over on the bed and put a pillow over her head and was trying to smother her."

David Dutton, a deputy district attorney testified that in

explanation of why Estella was carrying a gun "she just stated that she was carrying the gun around in her purse because she was afraid that Ray was going to kill her and that she knew she wasn't supposed to do it, but she was carrying it around because she thought she had to." Dutton also said that Estella had told him about the San Francisco incident "where he had forced her to go to a hotel or a motel and stay or sleep with him, and that he had threatened her with bodily harm."

Dr. Benjamin Major testified that Estella told him that Hamilton "had made threats to make trouble for her. . . . I am not sure that these were threats regarding bodily harm, but that they were threats regarding making trouble for her at any rate."

Officer Howard Smith testified that in February 1959, Estella told him that defendant had tried to force his way into her apartment and removed a record player, and also that he had taken some of her clothing.

Officer Claude Glenn testified that in February of 1959 Estella had told him "that her husband had in the past made threats against her life" and also told him that defendant "she thought, was going to kill her, that she feared for her safety. . . ."

Attorney A. T. Jackson testified "Well, she told me, I imagine, eight or ten times that he had threatened to take her life."

The cumulative effect of this testimony was to tell the jury repeatedly, mainly through the mouths of law enforcement officers, that on innumerable occasions defendant had beaten or sexually assaulted his former wife and had threatened to kill her. Most of this testimony, in our opinion, was inadmissible.

█ Undoubtedly, in a proper case, and in a proper manner, testimony as to the "state of mind" of the declarant, where there is an issue in the case is admissible, but only when such testimony refers to threats as to future conduct on the part of the accused, where such declarations are shown to have been made under circumstances indicating that they are reasonably trustworthy, and when they show primarily the then state of mind of the declarant and not the state of mind of the accused. █ But there are and should be rigid limitations on the admission of such testimony. One of these limitations is that such testimony is not admissible if it refers

solely to alleged past conduct on the part of the accused. This is so because to try and separate state of mind from the truth of the charges is an almost impossible task. The serious prejudice from such evidence is obvious. ▮ When the declarations are of such a nature as to be obviously prejudicial, and where any possible proper benefit to the prosecution is far outweighed by its prejudicial effect to the accused, such evidence should be excluded. As was said in *Estate of Anderson*, 185 Cal. 700, 719 [198 P. 407], in reference to just such declarations: "Under such circumstances, where the true evidentiary bearing of the evidence is at best slight and remote, and yet the evidence is of a nature such as to make it very prejudicial to the party against whom it is offered, the evidence should be excluded."

▮ This court has declared that "under certain circumstances declarations are admissible to prove a state of mind at a particular time although uttered before or after that time, apparently on the theory that under these particular circumstances '[t]he stream of consciousness has enough continuity so that we may expect to find the same characteristics for some distance up or down the current.' [Citing authorities.]" (*People* v. *One 1948 Chevrolet Conv. Coupe*, 45 Cal.2d 613, 621 [290 P.2d 538, 55 A.L.R.2d 1272]; and see *Watenpaugh* v. *State Teachers' Retirement System*, 51 Cal.2d 675, 679 [336 P.2d 165].)

This rule permitting such declarations to be admitted apparently originated in the case of *Aveson* v. *Ld. Kinnaird*, 6 East 188, 195, 102 Eng. Rep. 1258, 1261 (K.B. 1805), where Lord Ellenborough held that statements of the declarant's then condition of health were admissible as part of the res gestae. (See Morgan, *A Suggested Classification of Utterances Admissible as Res Gestae* (1922), 31 Yale L.J. 229, 233-234. But even under this limited rule eminent scholars in the law saw the many difficulties in its application, and many articles were written as to its proper scope. (See for a few of these discussions, Hinton, *States Of Mind And The Hearsay Rule* (1934), 1 U.Chi.L.Rev. 394; McBaine, *Admissibility in California of Declarations of Physical or Mental Condition* (1931), 19 Cal.L.Rev. 231, 367; Hutchins and Slesinger, *Some Observations On The Law Of Evidence: State Of Mind In Issue* (1929), 29 Columb.L.Rev. 147; Hutchins and Slesinger, *Some Observations On The Law Of Evidence— State Of Mind To Prove An Act* (1929), 38 Yale L.J. 283; Maguire, *The Hillmon Case — Thirty-Three Years After*

(1925), 38 Harv.L.Rev. 709; Chafee, *The Progress of the Law, 1919-1922 Evidence. II* (1922), 35 Harv.L.Rev. 428, 443; and Seligman, *An Exception To The Hearsay Rule* (1912), 26 Harv.L.Rev. 146.)

From these discussions several general principles have developed. One is that, while declarations directly asserting the existence of a mental condition on the part of the decedent-declarant, and not including a description of the past conduct of a third person that may have caused that mental condition, are and should be admissible, they should be admitted only where there is at least circumstantial evidence that they are probably trustworthy and credible. As was said by this court in *People* v. *Brust,* 47 Cal.2d 776, 785 [306 P.2d 480], in quoting from *People* v. *Weatherford,* 27 Cal.2d 401, 421 [164 P.2d 753], such declarations are "admissible only if there appears to be a necessity for that type of evidence and a circumstantial probability of its trustworthiness (V Wigmore, p. 202, § 1420). . . . The death of the declarant creates the necessity for resort to hearsay and the declarations, being those of a present existing state of mind, made in a natural manner and not under circumstances of suspicion, carry the probability of truthworthiness. (VI Wigmore, § 1725, p. 80.)" (See also McCormick, Evidence (1954), § 268, p. 568.) Wigmore also has stated that such declarations are admissible only when they are "made at a time when there was no motive to deceive." (6 Wigmore, Evidence, (3d ed. 1940), § 1730, p. 94.)

Certainly, some of the otherwise admissible declarations of the decedent as to her fear of defendant because of threats (as well as the great mass of inadmissible declarations) were not made under circumstances that indicated that they were probably trustworthy. They were made by Estella to explain why she was carrying a gun, and when she was trying to escape going to jail for doing so.

There is an additional reason why the great mass of these declarations were inadmissible, and that is that most of them referred to past acts of the defendant. In such cases the authorities are agreed that it is impossible for the jury to separate the state of mind of the declarant from the truth of the facts contained in the declarations, and that for such reasons such declarations are inadmissible. The late Professor McBaine correctly declared the rule when he stated: "If declarations of belief or memory should be received to

prove a past act, there would be not much left of the Hearsay rule, and generally the courts hold that such declarations are inadmissible hearsay." (McBaine, *Admissibility in California of Declarations of Physical or Mental Condition* (1931), 19 Cal.L.Rev. 231, 367, at p. 370. And see *Shepard* v. *United States*, 290 U.S. 96, 106 [54 S.Ct. 22, 78 L.Ed. 196] ; McCormick, Evidence (1954), § 268, p. 568; and Uniform Rules of Evidence, rule 63 (12).)

The reasons for the rule not permitting such declarations to be admitted are well illustrated in the instant case. By these declarations the prosecutor was able to tell the jury, mainly through the mouths of law enforcement officials, that on innumerable occasions defendant had brutally beaten his ex-wife, and otherwise assaulted her. In a not very subtle way it told the jury what kind of man it was that was before them on trial. It will not do to say, as does the attorney general, that the jury was told that these declarations were not to be considered for their truthfulness but merely as verbal acts casting light upon Estella's state of mind. It is difficult to believe that even the trained mind of a psychoanalyst could thus departmentalize itself sufficiently to obey the mandate of the limiting instruction.[1] Certainly a lay mind could not do so. It must be remembered that the theory upon which such evidence is admitted is that the declarations are evidence of the real state of mind of the declarant. The state of mind (fear of defendant) could only reasonably exist, when based not on threats but on conduct of the accused, when the declarations contain a description of the conduct causing that state of mind. In other words, in such cases it must be inferred that the declarant had this mental state of fear only because of the truthfulness of the statements contained in the assertion. In the present case, it must inevitably follow that if the jury believed that Estella was in fear of her life, it was only because defendant had in fact beaten and otherwise assaulted her. Logically, it is impossible to limit the prejudicial and inflammatory effect of this type of hearsay evidence.

These conclusions are not conjectural. They have been recognized by several courts, including the United States Supreme Court. In the leading case of *Shepard* v. *United States, supra*, 290 U.S. 96, there had been admitted the declaration of the deceased made about a month before she died : "Dr. Shepard

---

[1]That such instructions are not always effective was clearly recognized by this court in *Adkins* v. *Brett*, 184 Cal. 252, pp. 258-259 [193 P. 251]; see also 1 Wigmore, Evidence (3d ed. 1940), section 13, p. 302.

has poisoned me." It is to be noted that this is a statement about a past transaction. Justice Cardozo, speaking for the court, first held that, under the facts, the declaration was not admissible as a dying declaration, and then discussed the question of whether it was admissible to show "state of mind," as had been held by the circuit court. It was contended that "state of mind" was at issue because defendant had introduced declarations of the deceased that the deceased had contemplated suicide. Thus the legal situation presented is identical with that here involved. The court held that the challenged declaration was not admissible to show "state of mind." In so holding the court used language particularly applicable to the instant case (p. 104) : "It will not do to say that the jury might accept the declarations for any light that they cast upon the existence of a vital urge, and reject them to the extent that they charged the death to some one else. Discrimination so subtle is a feat beyond the compass of ordinary minds. The reverberating clang of those accusatory words would drown all weaker sounds. It is for ordinary minds, and not for psychoanalysts, that our rules of evidence are framed. . . . When the risk of confusion is so great as to upset the balance of advantage, the evidence goes out." Justice Cardozo then pointed out instances in which "state of mind" declarations may be admissible, and stated (pp. 105-106) : "Declarations of intention, casting light upon the future, have been sharply distinguished from declarations of memory, pointing backwards to the past. There would be an end, or nearly that, to the rule against hearsay if the distinction were ignored.

"The testimony now questioned faced backward and not forward. This at least it did in its most obvious implications. What is even more important, it spoke to a past act, and more than that, to an act by some one not the speaker. Other tendency, if it had any, was a filament too fine to be disentangled by a jury."[2]

We are not without authority in this state. In *People* v. *Talle*, 111 Cal.App.2d 650 [245 P.2d 633], the District Court

[2] These last-quoted comments are particularly applicable to the many acts of brutality which the witnesses testified Estella had declared defendant had committed. As to these declarations of past conduct on the part of defendant there is no possible theory under which they were admissible as an exception to the hearsay rule. These declarations total over half of those admitted. As was said by this court in *People* v. *Perkins*, 8 Cal.2d 502, 517 [66 P.2d 631], to be admissible, especially when self-serving, such declarations must not be "a mere narration of a past transaction."

of Appeal in speaking of declarations not nearly as damaging as those here, stated (pp. 670-671) : "Here was a voice from the grave charging appellant with past acts of brutality and cruelty, and charging that he had made threats against his wife's life. [Precisely the situation here involved.] How could the jury possibly disentangle the charges in that letter and treat the letter only as evidence of state of mind, and forget about the substance of the charges? How could the defendant meet such a situation? He could not cross-examine the deceased. Her lips were sealed. Here was a self-serving statement prepared for a partisan purpose against which the accused was powerless to defend.[3] It will not do to say that it was admitted for the limited purpose of showing state of mind of the deceased, and, even if erroneously admitted, could not be prejudicial. To be admissible, even when state of mind is in issue . . . the statement must be made under circumstances so as to make it reasonably certain it was not the result of a partisan premeditated plan to accuse."[4]

The United States Supreme Court and the District Court of Appeal could have been speaking of the instant case. How could this jury avoid the "reverberating clang" of these accusations from the grave? How could it disentangle state of mind from the truth of accusations? The answer is that this is an impossible mental feat.

Certainly, the record shows that the prosecuting attorney was unable to separate state of mind from the truth of the charges. The record shows that in his opening statement to the jury the prosecuting attorney, in stating what he expected to prove, stated that the jury would be looking for a motive and that such motive could be found in defendant's actions during and after his marriage to the decedent; that during this period "defendant had made threats against the life of Estella while they were married and after they were divorced. These threats were not just one or two; they occurred numerous times to the extent that she became afraid of him. . . . At one time while she had some company at her place . . . he forcibly

---

[3] The same can be said of one of the diary entries and many of the other declarations. As already pointed out, many were made at a time when the deceased had been charged with carrying a gun and at a time when she was trying to establish some justification for this act. Certainly they were self-serving statements.

[4] McCormick, Evidence (1954), § 268, p. 568, states that to be admissible such declarations must be made "under circumstances indicating apparent sincerity."

entered her home, forced her to go to San Francisco and stay with him overnight. . . .

". . . She also moved about from place to place to keep away from the defendant, but he'd always find out where she was. . . .

". . . This did not stop the defendant from coming over to her place, also going to the hospital when she was operated on a short while before she met her death, at which time he told her, words to the effect, that he could punch her in the stomach—that is where she had the operation—punch her in the stomach and kill her and nobody would know anything about it.

". . . She was questioned concerning this vaginal bleeding. At that time she explained that the reason why she was bleeding vaginally was because of the beatings about the torso, as we would call it, or the stomach, that were administered by the defendant."

The only "evidence" of these facts that was introduced during the trial was the declarations offered solely to prove "state of mind." We must certainly assume that when this opening statement was made the prosecutor knew that the only "evidence" he had to prove these facts was these declarations. We must also assume that the prosecutor knew that such declarations, as far as being evidence of the truth of the charges was concerned, were inadmissible hearsay and could only be introduced, if at all, on the issue of the then "state of mind" of the decedent. Moreover, until the defendant took the stand and testified that he was friendly with Estella and had been invited by her to her home the night of the homicides, the prosecutor did not know that "state of mind" might become an issue in the case. Certainly, we should not assume that the prosecutor was deliberately acting in bad faith. If he were, it would be a serious error. It is much more charitable to indulge in the only other inference possible, that is that the prosecutor was acting in good faith because he could not separate in his mind the truth of the charges from the "state of mind" of the decedent. If the trained legal mind of the prosecutor could not limit the declarations to the limited purpose allowed by law, how was the jury to accomplish this almost impossible bit of mental gymnastics?

That the prosecuting attorney was, to be charitable, confused as to the significance of these declarations is also demonstrated by his closing argument. Again and again he asserted that he had proved the truth of the matters as-

serted in the declarations of the deceased, when he knew that the only "evidence" of them was the declarations themselves. He told the jury again about the vaginal bleeding and that this belief of the decedent was caused by "the repeated beatings that she had received from the defendant." He then referred again to the vaginal bleeding, and stated: "If someone came along and beat me about the abdomen and for some reason or another I expectorated blood and I reached the conclusion or I stated, rather, that this blood that I am expectorating is due to the beating, am I unreasonable about it?" Then the prosecutor read the accusatory declarations contained in the diary, argued that they correctly depicted what had happened on those days. Defense counsel vigorously objected and the trial court said: "As to state of mind, not as to the truth. You are arguing now what truly happened on April 21st is what happened there. I admit it is a fine distinction." The prosecutor tried to rephrase his statement stating that he wanted to show the "fears" of the decedent. Later he stated: "Now, were her fears justified? Were they paranoidic [*sic*]? Were they thoughts of an emotional, upset woman? Or were they threats that had some foundation to them? Were they well-founded?"

Again and again this type of error occurred. Either the prosecuting attorney was deliberately flaunting the limitations placed by the court on the evidence and was deliberately trying to convince the jury of the truth of the threats and that the brutality had actually occurred, or he found it impossible to indulge in the mental maneuvers required by the limiting instruction. In either event it was error, and error of a most serious nature.

Were these errors prejudicial? There is undoubtedly evidence, and very substantial evidence, that defendant killed the two victims, and did so with malice and premeditation. On the other hand, if defendant's story were believed, the jury could have found that the killings were of a lesser degree. Whether or not the erroneously admitted declarations tipped the balance is something we cannot possibly know. Certainly, it is reasonably possible that the erroneously admitted declarations may and could have tipped the scales against defendant. Under such circumstances the defendant has been denied the fair trial to which he was entitled. This being so, the judgments and orders must be reversed.

For the benefit of the court on the retrial, some mention should be made of the instructions given by the trial court

on the "felony-murder" doctrine. Defendant contends that this was error. The challenged instruction was the conventional one that told the jury, in substance, that the prosecution, in addition to proceeding on the theory that the killings were of the first degree because they were wilful, deliberate and premeditated, was proceeding on the premise that the killings were of the first degree because committed by the defendant in the perpetration or attempt to perpetrate a burglary. The burglary, as explained by the trial judge, consisted of entering a dwelling with the intent to commit a felony therein, namely an assault with a deadly weapon.

 Defendant contends that the instruction on the "felony-murder" doctrine was error because the felony element of the burglary was an integral ingredient of the homicide itself. It is urged that to thus utilize an ingredient of the homicide to find the elements of a burglary so that the homicide can be automatically converted by application of the "felony-murder" doctrine into murder of the first degree, is a "bootstrapping" arrangement which the defendant contends was never intended by the Legislature. In support of his contention defendant urges that where, as here, the felony itself (burglary) results from the existence of the very intent necessary to establish the homicide, that the element of causation necessary for application of the doctrine is not present. It is the theory of the defendant that the "felony-murder" rule should only be applied when the felony involved is an independent felony and not an integral part of a homicide plan. While it is true that this independent felony test has apparently been adopted in New York (*People* v. *Huter*, 184 N.Y. 237 [77 N.E. 6], and that a reasonable argument can be made that such should be the rule, it is not the rule that has been applied in California. At a very early date this state adopted the rule set forth in the instructions (*People* v. *Miller*, 121 Cal. 343 [53 P. 816]). In a case somewhat similar to the one here this court recently reexamined and reaffirmed the doctrine (*People* v. *Mason*, 54 Cal.2d 164 [351 P.2d 1025]; see also *People* v. *Cartier*, 54 Cal.2d 300 [353 P.2d 293]; *People* v. *Morlock*, 46 Cal.2d 141 [292 P.2d 897]; *People* v. *Jones*, 184 Cal.App.2d 464 [7 Cal.Rptr. 424]; *People* v. *Laya*, 123 Cal.App.2d 7 [266 P.2d 157]). The rule as adopted in this state is not clearly wrong, nor is the New York rule clearly right. Either conclusion is equally reasonable. There is no sound reason why California should change its rule at this late date.

For reasons already stated the judgment and orders appealed from are reversed.

Gibson, C. J., Traynor, J., and Dooling, J., concurred.

WHITE, J.—I dissent.

As I read the majority opinion in this case it concedes, as therein stated, "Undoubtedly, in a proper case, and in a proper manner, testimony of the 'state of mind' of the declarant, where that is an issue in the case *is admissible*, but only when such testimony refers to threats *as to future conduct* on the part of the accused, where such declarations are shown to have been made under circumstances indicating that they are reasonably trustworthy, and when they show primarily the then state of mind of the declarant and not the state of mind of the accused. But there are and should be rigid limitations on the admission of such testimony. One of these limitations is that such testimony is not admissible if it refers solely to alleged past conduct on the part of the accused." (Emphasis added.)

In the instant case defendant sought to absolve himself of the prosecution's contention that he went to Estella's home with an evil intent by his testimony that he had an appointment, solicited by Estella, to see her at her home, which accounted for his visit there. Thus, Estella's "state of mind," that is, her attitude toward the defendant was put in issue by the defendant. Manifestly, if she was in fear of the defendant serious doubt would thus be cast on the defendant's story that she had invited him to her home, by evidence of those fears. If the purpose of admitting such evidence is to show the "state of mind" of the declarant where, as in the instant case, it was concededly an issue in the case, then I am at a loss to understand why declarations of threats to do future violence should be regarded as less prejudicial than the narration of alleged past conduct. And surely if the purpose of admitting "state of mind" testimony is to be achieved, then as in the instant case, such a state of mind as fear of the defendant could be engendered by past actions of brutality, probably more so than by unexecuted threats of promised future harm to the declarant. Complaint is made in the majority opinion that testimony of past conduct tends more to establish the state of mind of the accused rather than of the declarant. Would not such a conclusion be as applicable to threats of future violence as to prior executed acts of violence?

This would appear to be a distinction without a difference.

I agree that evidence of this character may be excluded as legally irrelevant if the court determines that its value is outweighed by policy considerations of undue prejudice, lapse of time or surprise. The majority opinion seems to hold that the evidence here was so highly prejudicial that it outweighed any probative value and should have been excluded. I feel that these are matters primarily addressed to the sound discretion of the trial court. The majority would completely emasculate the rule providing for "state of mind" testimony unless it refers to threats as to future conduct on the part of the accused, thereby withholding from the trier of facts evidence of past conduct which would materially aid the arbiter of facts in determining whether the declarant was actually in fear of the accused. I am apprehensive lest such a rule would militate against convictions of murder in proper cases.

In the case now engaging our attention, the court admittedly throughout the trial carefully pointed out to the jury that the evidence was being admitted for the limited purpose of showing the deceased's state of mind and they were to consider it for that purpose only. On one occasion the trial judge stated: "Such testimony is not admissible to prove that such threats or acts of violence did occur and you are not to consider it as proof of the truth thereof. Now I appreciate that is a very difficult concept, but this testimony along this line, whatever it may be, is not to be taken by you as proof that those things actually did occur. It simply throws whatever light you may want to put on it as to the frame of mind of Estella Hamilton towards the defendant Ray Hamilton."

On another occasion the trial judge stated: "I think the Jury understands that regardless of who was right or wrong in these altercations, would make no difference. This is a very limited purpose to show the state of mind of Estella toward the defendant, Ray Hamilton. That's all. Regardless of who was right or wrong on these differences that may have existed between them."

Again in the instructions to the jury, the court stated: "Testimony as to threats made by the defendant or any acts of violence by him upon the decedent, Estella Hamilton, or the decedent, Lorenzo Bernard, would of course be admissible if given by witnesses who state that they heard the defendant make such threats or who saw such acts of violence committed, but testimony of any witness which is based upon what such

decedent told him, is hearsay, and is ordinarily not admissible. However, when the state or frame of mind of a decedent is material and relevant, such testimony is admitted for a limited purpose only, that is, for such bearing, if any, as it may have on showing what the state of mind of said decedent was on the night of May 20th, 1959. Such testimony is not admissible to prove that such threats were uttered or such acts of violence did occur, and you are not to consider it as proof of the truth thereof.

''However, if you should find from the evidence that either decedent did make a statement or statements to such effect prior to May 20th, 1959, you must then also consider whether such a statement was made in good faith and in honest belief as to the truth thereof. In other words, to put the question conversely, was the decedent who made such statement, actually in fear of defendant or was such statement to that effect merely a sham and not a true expression of the state of mind of such decedent?''

Manifestly, whether the value of material evidence is outweighed by its prejudicial character is a matter within the discretion of the trial court, and its decision should not be overturned on appeal unless it can be shown that the court has substantially abused its discretion.

To me it seems a sad commentary upon the intelligence of jurors, in the light of the court's constant, painstaking and specific admonitions, to say that they were unable to follow them or that in violation of their sworn obligations as jurors they cast aside such admonitions. I cannot indulge in either of those assumptions, particularly where, as in this case, the evidence not only established defendant's guilt beyond a reasonable doubt but was demonstrative thereof.

Since the question of whether defendant went out to the home of one of his victims (Estella) on the evening of the homicides, upon the invitation of the latter, was an important issue to be determined by the jury, I am impressed it was well within the court's discretion to conclude that the value of proper and material inferences warranted by the testimony far outweighed any undue prejudice which might have resulted to the defendant, particularly where, as stated, the court gave frequent, meticulous and proper instructions designed to eliminate any such undue prejudice.

I concede that it was improper for the district attorney in his opening statement to the jury to state, in setting forth what he expected to prove, that a motive would be found in

defendant's conduct toward Estella during and after his marriage in that during this period defendant made threats against the life of Estella as is more fully pointed out in the majority opinion, when the only evidence offered at the trial was the declarations admitted to prove "state of mind" of the deceased Estella. However, I am satisfied that any prejudice to defendant in this regard was cured by the foregoing admonitions of the trial judge, and that no miscarriage of justice has resulted. (Cal. Const., art. VI, § 4½.)

For the foregoing reasons, I would affirm the judgment and the order denying defendant's motion for a new trial.

Schauer, J., and McComb, J., concurred.

Respondent's petition for a rehearing was denied June 21, 1961. Schauer, J., McComb, J., and White, J., were of the opinion that the petition should be granted.