Filed 6/10/25  P. v. Clark CA5

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>BRANDON DANIEL CLARK,<br><br>Defendant and Appellant. | F085286<br><br>(Super. Ct. No. BF171472A)<br><br>**OPINION** |

-ooOoo-

APPEAL from orders and a judgment of the Superior Court of Kern County. Michael G. Bush and John R. Brownlee, Judges.[*]

Galit Lipa, State Public Defender, Ann Lahyung Kim and Hassan Gorguinpour, Deputy State Public Defenders, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Kimberley A. Donohue, Assistant Attorney General, Darren K. Indermill and Jeffrey D. Firestone, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

---

[*] Judge Bush ruled on the motion for mental health diversion; Judge Brownlee presided over all other hearings pertinent to this appeal.

# INTRODUCTION

Defendant Brandon Daniel Clark used an assault rifle to shoot out the glass door of the hospital where his mother worked and, while searching for her, pointed the rifle in front of him as he encountered several employees. After a jury convicted him of five counts of assault with a semiautomatic rifle, shooting at an occupied building, and other charges, the trial court sentenced him to a total term of 20 years 4 months in prison. Defendant argues, and the People agree, that the matter should be conditionally reversed and remanded to permit the trial court to reconsider the appropriateness of mental health diversion under recent changes to the law. He further challenges his conviction and argues that (1) the trial court prejudicially erred in excluding testimony as to defendant's statements that cartel members intended to harm his mother because such testimony was relevant to his general intent to commit assault with a semiautomatic rifle and shooting at an occupied building and (2) the evidence is insufficient to support the verdicts for two counts of assault with a semiautomatic rifle. We accept the People's concession and conditionally reverse for further mental health diversion proceedings but otherwise affirm the judgment.

# PROCEDURAL BACKGROUND

On March 14, 2018, a third amended indictment was filed in Kern County Superior Court, charging defendant with shooting at an occupied building (Pen. Code, § 246;[1] count one), assault with a semiautomatic firearm (§ 245, subd. (b); counts two–twelve),[2] possession of a firearm by a felon (§ 29800, subd. (a)(1); count thirteen), possession of ammunition by a felon (§ 30305, subd. (a)(1); count fourteen), possession of a firearm while under the influence of a controlled substance (Health & Saf. Code, § 11550, subd. (e); count fifteen), possession of an assault rifle (§ 30605; count sixteen),

---

[1] Undesignated statutory references are to the Penal Code.

[2] Counts two through twelve name eight separate victims.

and shooting at an inhabited dwelling (§ 246; count seventeen). The third amended indictment additionally alleged that defendant personally used a firearm (§ 12022.5, subd. (a)) and an assault weapon (§ 12022.5, subd. (b)) as to counts two through five and seven through twelve.

The court denied defendant's motion for pretrial mental health diversion (former § 1001.36) without prejudice on May 29, 2019, due to a lack of programs available in the county and denied the motion on the merits with prejudice on January 16, 2020, after finding that defendant was a danger to the community. After the court found defendant competent to stand trial, defendant entered pleas of not guilty and not guilty by reason of insanity on February 19 and 21, 2020.

On June 8, 2022, prior to trial, defendant withdrew his insanity plea and the court granted the prosecutor's motion to dismiss counts two, seven, twelve, fifteen, and seventeen. On June 23, 2022, the jury convicted defendant of counts one, four, five, eight, nine, ten, thirteen, fourteen, and sixteen[3] and found true the enhancements as to those counts. The jury found defendant not guilty of counts three and eleven and their lesser included offenses.

The trial court sentenced defendant on November 10, 2022, to a six-year term of imprisonment, plus six years (§ 12022.5, subd. (b)), and a stayed four-year term (§ 12022.5, subd. (a)) as to count four. The court also imposed a consecutive one year eight-month term as to count one; two-year terms of imprisonment, plus stayed four- and two-year terms on the gun enhancements (§§ 12022.5, subd. (a), 12022.5(b)), as to

---

[3] Although the third amended indictment charged defendant with shooting at an occupied building and the jury was so instructed, the verdict erroneously describes the charge for count one as "Shoot at Inhabited Dwelling (… Hospital)," an error which is also reflected in the abstract of judgment. We order the trial court to correct the abstract of judgment to reflect the correct description of count one. Additionally, although count six was included in the charges read to the jury at the commencement of trial, the court instructed the jury that count six had been removed from their consideration. The court record does not otherwise indicate any disposition for count six.

counts five, nine, and ten; and a consecutive eight-month term as to count thirteen, for a total term of 20 years 4 months in prison. As to counts eight, fourteen, and sixteen, the court imposed stayed terms of imprisonment of three, two, and two years, respectively.[4] Additionally, the court ordered defendant to pay victim restitution (§ 1202.4, subd. (f)), $300 restitution and suspended parole revocation restitution fines (§§ 1202.4, subd. (b), 1202.45), $360 in court operations assessments (§ 1465.8), and $270 in criminal conviction assessments (Gov. Code, § 70373).[5]

Defendant filed a timely notice of appeal on November 11, 2022.

## FACTS[6]

### I.      *Prosecution evidence.*

### A.      **Defendant arms himself and gets a ride to the hospital**

On December 1, 2017, defendant stopped his pickup truck outside Michael Dawson's house due to engine trouble. Although he did not know defendant, Dawson

---

[4] We note that the November 10, 2022 sentencing minute order incorrectly reflects a two-year sentence as to count eight, but, while the court originally pronounced a two-year prison term (one-third the middle term), it corrected itself shortly thereafter and changed the term to the lower term of three years. The abstract of judgment incorrectly reflects that the court imposed the middle term as to count eight.

[5] The abstract of judgment provides that the total amount of assessments is $240 (§ 1465.8) and $180 (Gov. Code, § 70373). However, the court imposed these assessments as to all nine counts of conviction. Section 1465.8, subdivision (a)(1) requires a $40 assessment "be imposed on every conviction for a criminal offense," and Government Code section 70373, subdivision (a)(1) requires a $30 assessment also "be imposed on every conviction for a criminal offense." Based upon nine counts of conviction, the correct assessments are $360 pursuant to section 1465.8 and $270 pursuant to Government Code section 70373. Although the court stayed terms of imprisonment as to three counts pursuant to section 654, these assessments are not stayed. (See *People v. Crittle* (2007) 154 Cal.App.4th 368, 370 [holding § 654 does not apply to fee pursuant to § 1465.8 because that fee is not punishment]; see also *People v. Sencion* (2012) 211 Cal.App.4th 480, 484 [holding § 654 does not apply to fee pursuant to § 1465.8 or Gov. Code, § 70373 because neither fee is punishment (collecting cases)].)

[6] We note that defendant's statement of facts includes facts of the crime contained within expert reports that addressed his mental competence to stand trial. However, we

4.

unsuccessfully attempted to help defendant fix the truck. Defendant appeared to be under the influence, as some of the things he said did not make sense, and desperate for a ride, explaining that people were after him. Dawson saw an AK-47 rifle in the bed of defendant's truck. The court sustained the prosecutor's objection to defense counsel's question as to whether defendant had stated why he wanted to go to the hospital based upon its prior in limine ruling.

Dawson agreed to provide defendant a ride, and defendant asked to be taken to the hospital and got into the front seat of Dawson's vehicle. Defendant had a dog with him. While driving, Dawson noticed that defendant had the AK-47 inside his pants. Dawson let defendant off at an intersection near the hospital and had to call him back to retrieve the dog. After picking up a firearm magazine that he had dropped, defendant took the dog with him.

### 1. Defendant shoots his way into the hospital (count one)

On December 1, 2017, Jessica Juhasz, a hospital emergency room clerk, received a call from an employee who requested that security respond to the employee entrance where a homeless person and a dog were present. Juhasz contacted security. The employee entrance required a key code to access. Juhasz could view the security feed from the cameras in her office, including the cameras at the employee entrance. Juhasz saw the back of an individual crouched down in the corner by the employee entrance and called security.

One of the security cameras pointed from inside the hallway toward the double-glass employee exit doors. The video was admitted into evidence. It shows an employee exiting the doors at approximately 4:40 p.m., and then reentering the hospital. At the

only include evidence presented at trial and do not consider evidence outside the trial record in addressing the issues raised by defendant's appeal. As issues raised in this appeal deal only with the counts charging assault with a firearm and shooting at an occupied building, we have not described all evidence presented at trial but only the evidence applicable to those charges.

same time, a security guard passes the returning employee, goes out the exit doors, and appears to speak to someone who is out of view of the camera. As other employees look on, a male employee attempts to exit the doors as the security guard steps back inside, and everyone moves quickly down the hallway and out of the view of the glass doors.

The video shows a man, holding a long weapon with a strap, outside the glass doors looking at the glass doors. For several minutes, the man alternates between leaning against the wall, pacing, and pulling on the doors. At one point, the man removes a handgun from his back waistband and points it with his arm fully extended. At another point, the man knocks on the doors. While on the phone, a security guard peers around the corner from inside the hospital and looks at the man.

Juhasz received a called from Michelle Oxford, the hospital's chief executive officer. Oxford had learned from a housekeeping employee that a man with a weapon (possibly a BB gun) hanging at his side was in the parking lot. After the call, Juhasz asked her partner to page a "code silver" (a threat caused by someone with a weapon) to the entire hospital. She then dropped the shields over the glass windows of the reception desk to obscure the employees there from view.

Juhasz called 911 and advised that a man with a gun was located at the back employee entrance of the hospital and she could see a security guard at the entrance on the security camera. She then advised that the man was banging on the doors, had a dog with him, and had a rifle on his arm. Juhasz advised that the man was preparing to shoot and, thereafter, that the man shot through the door and entered the hospital. Juhasz testified that she heard at least three shots fired, but she did not see anyone in the hallway at that time.

Mark Hollenbaugh was the hospital's biomedical supervisor and heard murmurs about someone outside with a gun. He approached the employee entrance from inside the hospital but remained in the hallway around the corner with several other hospital employees, including David Christophers. Christophers worked as an engineer in the

6.

hospital, assisted in maintaining the building, and testified that he had learned of the code silver and accompanied Hollenbaugh to the employee entrance. Security Guard Landon Russell called 911. The recording was introduced into evidence. Russell reported that a man armed with a black pistol, who appeared to be on drugs, attempted to follow him through the employee entrance and the hospital was in lockdown. Defendant told Russell that he was waiting for his mother who worked in the documents department.[7] Russell indicated that the hospital did not have a documents department and asked defendant to leave, but defendant then displayed a gun and threatened Russell by saying, "If I were you[,] I'd get out of here, unless you wanna go down too."

Christophers heard someone yelling as they shook or kicked the door. Hollenbaugh heard defendant bang on the entrance door while yelling that he wanted to see his mother. They stood in the hallway for several minutes before hearing gunshots.

The security video shows defendant fire at the glass doors and then enter the hospital through the broken doors, carrying his rifle as he runs down the hallway and out of the camera's view.

### 2. Defendant's actions inside the hospital

#### a) Interaction with Hollenbaugh

Hollenbaugh and Christophers instructed other individuals to go to their predesignated areas and directed those coming toward them in the hallway to go the opposite direction. Hollenbaugh jogged a short way down the hall, then turned around and saw defendant with a long rifle. Defendant was holding the rifle "[s]loppily" and twisting his body as if looking for someone. Hollenbaugh demonstrated the manner in which defendant held the weapon, which the court described as being at waist level with defendant's right hand on the grip, his left hand on the forestock, and swinging his entire

---

[7] Defendant's mother, Vickie Mocan, was at the hospital working as a clinical documentation specialist.

body and rifle simultaneously. There were times when defendant held the rifle with only one hand.

Hollenbaugh asked defendant if he could help. Defendant said that he was looking for his mother. Hollenbaugh asked her name and for additional information as to where she worked. Defendant's speech was incoherent, "sloppy," and "slurred." Hollenbaugh testified that while speaking with defendant, defendant turned toward Hollenbaugh, which pointed the rifle in Hollenbaugh's general direction. Hollenbaugh did not feel threatened but was worried that the rifle could discharge accidentally.

### b) Interaction with David Christophers

Defendant walked away from Hollenbaugh, and Hollenbaugh heard defendant speaking with Christophers. Christophers had walked to the nurse station and saw defendant standing in the open double doors. Defendant was looking at Christophers and pointing a rifle at him. Defendant may have been cradling the rifle before pointing it at Christophers. Defendant was holding the rifle parallel to the ground with his left hand on the pistol grip and his right hand on the foregrip with his arms extended. He told Christophers that his mother needed help and stood there for one minute.

While employees left the area, Christophers tried to calm defendant by telling him that he had not done anything that could not be changed, asked defendant to put the gun down, and said that Christophers would take care of defendant's mother. Defendant said that he did not intend to shoot anyone, but Christophers pointed out that defendant had already shot the building, so Christophers believed that defendant would shoot. Defendant was "very incoherent," spoke fast, and seemed "stressed."

While Christophers was speaking with defendant, defendant turned and addressed someone else. Defendant pointed the rifle at the other individual, whom Christophers later learned was Hollenbaugh, and then defendant turned back and pointed the rifle at Christophers. Defendant then turned and walked away toward the employee entrance.

8.

c)      Interactions with Oxford, Womack, and Cunanan

Registered Nurse Lynn Berkshire testified that she was working with a patient when she heard the code silver. She gathered people from the front lobby into the day patient area near the nurse station. Christophers entered the area and directed them to run. Berkshire saw a man and a dog. The man was holding a large gun at waist level with his arms parallel to the ground. Berkshire ran toward the administration area and saw defendant walking around in the administration foyer where Oxford and Chief Nursing Officer Laura Cunanan had offices. Berkshire then ran in the opposite direction.

Oxford was in her administrative office with Secretary Timesha Womack and Cunanan when they heard the code silver announced over the intercom system. After several minutes, Oxford peeked out of a window to view the parking lot and left the administrative offices because it seemed clear. She saw defendant approaching from approximately 12 feet away and backed into the administration offices. Defendant was looking into the day patient area and, when he noticed Oxford, turned his body and the weapon toward her to face her directly. Defendant made eye contact. Oxford described that the weapon was on a sling and defendant held it waist high with both hands, his left hand was close to his waist area and his right hand extended forward. When he turned, the weapon pointed at her and she was frightened. Defendant was wearing jeans, a big jacket, and glass was "coming off" him. She concluded he was confused because he was in a hospital with a weapon and thought he might be looking for something.

Defendant walked toward Oxford while she backed into the administration offices. Oxford told Womack and Cunanan that defendant was right outside the door. The three of them went into Cunanan's office, closed the door, and sat down using their backs to hold the door closed. Oxford heard the outside door to the administration area open and close. Cunanan called 911 to advise that defendant was in that area. At one point, Oxford believed defendant was pacing because she peeked through a window and could see his head.

9.

Cunanan testified that she went into her office to prepare to go home after hearing the code silver announced and then heard a noise outside the door. Accompanied by Oxford and Womack, she walked to the door and opened it. She saw defendant with a large black gun looking around the hallway. Defendant was approximately 15 or 20 feet away and looked at them. Cunanan demonstrated that defendant held the rifle parallel to the ground with his right hand on the rear grip and his left hand on the forestock. When he turned, defendant looked and pointed the rifle at them.

Cunanan testified that when defendant turned his body, the rifle moved with him and aligned to where they were standing, but he did not purposefully point it at her. Defendant appeared confused as he looked around, as if he did not know where he was going. She had previously testified to the grand jury that defendant seemed disheveled and not focused. Cunanan screamed and ran with Oxford and Womack back into her office. The three of them crouched behind her office door, and she heard the waiting room door open and close and then footsteps right outside her door.

Cunanan called 911. That recording was admitted into evidence. Cunanan reported that she was in the administration office on the first floor and defendant was right outside the door, armed with a rifle. She remained on the phone until learning that defendant had been taken into custody. Cunanan testified that she was very scared because defendant was right outside their office with a big gun, and she believed that he was going to shoot.

### d) Second interaction with Hollenbaugh

Defendant walked down the hallway back to Hollenbaugh's location and asked where his dog had gone. Hollenbaugh suggested that defendant go outside the hospital to look for his dog and followed as defendant left through the employee entrance. After defendant walked outside the employee entrance doors, Hollenbaugh stood in the hallway near the corner and continued to talk to defendant about his dog. Both men called for the

dog. Hollenbaugh told defendant that police had entered the building and urged him to run. He did that so that defendant would not reenter the building.

Hollenbaugh described that defendant held the rifle in front of him and, when defendant turned, the rifle turned too. Hollenbaugh was not focused on the rifle and did not know whether defendant intended to point it at him or whether the rifle's barrel just moved when defendant turned his body, but Hollenbaugh agreed that the rifle was pointed in his direction.

Security camera footage shows defendant, holding the rifle at his side with one hand, leave through the broken glass doors at the employee entrance approximately three minutes after entering. It shows Hollenbaugh looking down the hallway speaking with defendant who had turned to face him. Defendant cradles the rifle as he alternately faces Hollenbaugh and looks toward the parking lot. Defendant walks away but then turns, raises the rifle to his shoulder, and points it toward Hollenbaugh who ducks around the corner in response. Hollenbaugh peeks from the corner, and defendant raises the rifle again and points it at Hollenbaugh before walking down the walkway. A police officer comes around the corner and fires at defendant. Defendant first falls to the ground, but then gets to his feet, is shot by another officer, and then falls to the ground.

After viewing the security video, Hollenbaugh testified that defendant pointed the rifle down the hallway toward where Hollenbaugh was standing, and Hollenbaugh moved out of the way.

### 3.     *Police officers shoot defendant in the parking lot*

Bakersfield Police Officer Felipe Juarez testified that he responded to the hospital's employee entrance and was advised that defendant was in the parking lot. He saw defendant carrying a rifle in the parking lot, about 50 feet away, and shot him two times. Defendant dropped the rifle after the first shot and fell to the ground after the second shot. Defendant immediately stood up and ran. At that time, Bakersfield Police Officer James Montgomery approached the hospital's parking lot and saw defendant

11.

running from Officer Juarez while ducking between parked cars. Unaware that Officer Juarez had shot defendant and defendant had dropped his two firearms, Officer Montgomery fired four times. Defendant was then arrested.

Cunanan and other hospital staff responded to the parking lot, placed defendant on a gurney, and transported him into the emergency room. Defendant asked Cunanan whether anyone intended to kill him when they got inside. She replied, "No, honey. We're going to take care of you."

### 4. *Additional evidence*

The walls and ceiling in the employee entrance hallway, as well as a laundry bin, displayed bullet strikes. Ammunition casings were recovered from the sidewalk, the ground near the hospital's employee entrance, a flower bed, and the parking lot. Officers also recovered a loaded semiautomatic rifle, a second firearm, and several loaded magazines of ammunition from the hospital's parking lot. Features of the rifle were consistent with the statutory definition of an assault weapon.

## II. Defense evidence.

Defendant's mother, Vickie Macon, testified to defendant's character, which she described as "soft-hearted and compassionate." Despite his struggle with alcoholism, defendant remained caring and loving and a part of his daughter's life, having served as her track coach. He also helped his mother with yard work and roofing repairs, was a hard worker, and had been in line to become a superintendent at his job.

## DISCUSSION

## I. *This matter must be conditionally remanded to permit the trial court to evaluate defendant's motion for mental health diversion in light of recent amendments to section 1001.36.*

### A. Background

On April 15, 2019, defendant filed a motion for the trial court to determine his eligibility for mental health diversion pursuant to former section 1001.36 and submitted a

12.

psychological evaluation of defendant's mental competency prepared by Dr. Gary Longwith. Dr. Longwith concluded that defendant met the criteria for schizoaffective disorder, delusional disorder, substance abuse induced psychotic disorder, and methamphetamine dependence. The trial court denied the motion without prejudice because the county did not yet have a treatment program.

Defendant refiled his request on September 16, 2019, and once again relied upon the mental competency evaluation prepared by Dr. Longwith. The prosecution opposed the motion, relying in part on conclusions of the mental competency evaluators that defendant was a danger to himself and others.[8] The trial court held a hearing on defendant's former section 1001.36 motion on January 16, 2020. The trial court explained, "[A]ssuming he's eligible," the issue appears to be "[w]hether or not he's suitable," and "I'm not sure on these charges I would send him to diversion." The court then denied defendant's motion: "Even if he were eligible, I'm going to find he's not suitable based on … this set of facts" because "I think he's a danger."

### B.      Applicable Law and Standard of Review

In May 2019, when defendant first brought his motion for mental health diversion, section 1001.36 listed six criteria that a defendant had to meet to be eligible for diversion. Three of the criteria required that the court be "satisfied" that (1) the defendant suffers from a recognized mental disorder, (2) the disorder was a "significant factor in the commission of the charged offense," and (3) "the defendant will not pose an unreasonable risk of danger to public safety, as defined in section 1170.18, if treated in

---

[8] The mental competency evaluations did not include discussion of any proposed treatment plan in the community. Dr. Kathe Lundgren concluded that defendant was competent to stand trial, a danger to himself and others, and diagnosed him as suffering from a depressive disorder, substance abuse disorder (alcohol, methamphetamine, opioid), and either amphetamine induced psychotic disorder or delusional parasitosis. Dr. R. Bruce Walker initially diagnosed defendant with schizophrenia spectrum and other psychotic disorder, recommended antipsychotic drugs, and concluded that defendant may become a danger to himself and others due to his delusional symptoms.

the community." (Former § 1001.36, subd. (b)(1)(A), (B), (F), as amended by Stats. 2018, ch. 1005, § 1, pp. 6631–6632, eff. Jan. 1, 2019.) The remaining criteria required that (1) a mental health expert provide an opinion that the defendant's mental health symptoms would respond to treatment, (2) the defendant give their consent to diversion and waive their right to a speedy trial, and (3) the defendant agree to comply with treatment as a condition of diversion. (*Id.*, subd. (b)(1)(C)–(E).)

A series of amendments to section 1001.36 became effective after defendant's conviction in this case. As relevant here, Senate Bill No. 1223 (2021–2022 Reg. Sess.) (Senate Bill 1223) amended section 1001.36, effective January 1, 2023, after the trial court denied defendant's motion. (Stats. 2022, ch. 735, § 1, pp. 8169–8173.)[9] Among other changes, the 2023 amendments recharacterized the first two requirements—that the defendant be diagnosed with a recognized mental illness and the mental illness be a significant factor in the commission of the charged offense—as eligibility criteria. (§ 1001.36, subd. (b)(1),(2).) Under the amended statute, "a defendant's eligibility no longer turned on findings to the court's 'satisfaction.' " (*Sarmiento v. Superior Court* (2024) 98 Cal.App.5th 882, 891.) A defendant is now generally eligible for diversion if the defendant "has been diagnosed" with a recognized mental disorder. Such a diagnosis creates a presumption that the defendant's diagnosed mental disorder was a significant factor in the commission of the charged crime. Overcoming that presumption requires clear and convincing evidence that the mental disorder was not a motivating, causal, or

---

[9] Defendant's argument addresses the retroactivity of Senate Bill 1223's amendments to section 1001.36, effective January 2023. (See Stats. 2022, ch. 735, § 1, pp. 8169–8173.) The People note that the 2023 version of section 1001.36 was repealed (Stats. 2023, ch. 687, § 1.1, pp. 6537–6541) and reenacted (Stats. 2023, ch. 687, § 1.2, pp. 6541–6544). Additional amendments to section 1001.36 are not material here, and section 1001.36 currently includes the 2023 amendments. (Compare Stats. 2022, ch. 735, § 1, pp. 8169–8173 with Stats. 2024, ch. 647, § 1.5, pp. 6297–6300.) We therefore quote the statute in its current form throughout the remainder of this opinion.

contributing factor to the defendant's involvement in the alleged offense. (§1001.36, subd. (b)(1)(2); *Sarmiento*, at p. 891.)

If the defendant meets the two enumerated eligibility requirements, "the court must consider whether the defendant is suitable for pretrial diversion." (§ 1001.36, subd. (c).) A defendant is suitable for pretrial diversion if four criteria are met, which include the opinion of a qualified mental health expert that the defendant's symptoms would respond to mental health treatment (§ 1001.36, subd. (c)(1)) and the defendant will not pose an unreasonable risk of danger to public safety, as defined in section 1170.18,[10] "if treated in the community" (§ 1001.36, subd. (c)(4)). Section 1001.36, subdivision (c)(4) was also amended to include consideration of the defendant's treatment plan, in addition to the defendant's violence and criminal history, current offense, and other factors the court deems appropriate.

Even where defendants make a prima facie showing that they meet all the express statutory requirements, the court has the discretion to deny diversion but do so " ' "consistent with the principles and purpose of the governing law," ' " which includes a strong legislative preference for such treatment of mental health disorders. (*Sarmiento v. Superior Court, supra*, 98 Cal.App.5th at pp. 892–893.) If "the court chooses to exercise this residual discretion to deny diversion, its statement of reasons should reflect consideration of the underlying purposes of the statute and explain why diversion would not meet those goals." (*Id.* at p. 893.)

A trial court abuses its discretion if it bases its decision on an incorrect legal standard. (*People v. Knoller* (2007) 41 Cal.4th 139, 156.)

---

[10] As used in sections 1001.36, subdivision (c)(4) and 1170.18, subdivision (b), " 'unreasonable risk of danger to public safety' " means an unreasonable risk that the defendant will commit a new violent felony as listed in section 667, subdivision (e)(2)(C)(iv), that is, sexually violent offenses, sex acts against minors, homicide, and other serious felonies punishable by life imprisonment or death. (§ 1170.18, subd. (c).)

## C. Analysis

Defendant argues, and the People concede, that the amendments to section 1001.36 apply retroactively to defendant's case. We accept that concession. (See *People v. Brown* (2024) 101 Cal.App.5th 113.)

The People assert that remand is required because the trial court failed to consider community treatment in assessing whether defendant posed an unreasonable risk of danger to public safety. We additionally note the trial court relied upon an expert evaluation concerning defendant's mental competency to stand trial that failed to address any community treatment plan relevant to defendant's disorder and failed to address any danger to public safety posed by defendant's diversion in light of community treatment. We agree that we must remand this matter in light of amendments to section 1001.36.

Defendant is entitled to the court's informed discretion on his motion for mental health diversion. (See *People v. Gutierrez* (2014) 58 Cal.4th 1354, 1391 [addressing court's sentencing discretion].) A court unaware of the scope of its discretionary powers " 'can no more exercise that "informed discretion" than one whose [decision] is or may have been based on misinformation regarding a material aspect of a defendant's record.' " (*Ibid.*) Under these circumstances, the proper remedy is to remand "unless the record 'clearly indicate[s]' that the trial court would have reached the same conclusion 'even if it had been aware that it had such discretion.' " (*Ibid.*) We decline to conclude on this record that the trial court would have clearly reach the same conclusions about eligibility or suitability under the new law. (See, e.g., *ibid.*)

We conditionally remand the matter for the trial court to reevaluate defendant's motion for mental health diversion pursuant to section 1001.36, as amended by Statutes 2022, chapter 735, section 1, pages 8169–8173. We express no view concerning the proper resolution of defendant's motion, whether defendant satisfies the eligibility or suitability factors, nor how the trial court should exercise its discretion on remand.

16.

## II. The trial court did not err in excluding evidence of defendant's belief in the need to rescue his mother from danger.

### A. Background

#### 1. Motion in limine hearing

The prosecutor filed a motion in limine to preclude evidence as to defendant's mental state pursuant to section 28.[11]  Defense counsel noted that, according to the grand jury testimony, many witnesses described defendant as having an "altered state," demonstrated by his handling of the rifle, his balance, and how he was walking.  Defense counsel objected to "taking out" such testimony because it would change the context of what had occurred.  Both the court and prosecutor agreed that the witnesses' observations of defendant would be admissible, although any opinion regarding whether defendant was under the influence of drugs would not.  Defense counsel agreed that "it [was] a fair way to approach it" and percipient witnesses could testify as to what they observed, but "it technically would not be correct to allow them to opine as to [defendant's] mental state."  With that understanding, the trial court granted the prosecutor's motion.

Defense counsel revisited the issue later in the hearing and represented that while present at the hospital, defendant said that he was trying to protect his mother because a Mexican cartel was trying to assault her.  She argued that this information, referring to defendant's statements, should be admitted to dispel any impression that defendant was there to hurt individuals working at the hospital, even though it would not negate the general intent element of assault with a firearm.  She argued that failure to permit the evidence would "improperly characterize[] his conduct in the potential mind of a juror as malicious."

---

[11] Section 28 provides that evidence of a mental disorder shall not be admitted to show or negate the capacity to form any mental state, including, purpose, knowledge, and intent (*id.*, subd. (a)) and prevents any defense of diminished capacity or responsibility (*id.*, subd. (b)).

The court ruled that defense counsel could not present evidence that defendant was present at the hospital to protect his mother from the cartel because it was not relevant to prove defendant's general intent to commit the crime and would possibly confuse the jury regarding mental aspects not relevant to the charges.

### 2. Evidence Code section 402 hearing

As an offer of proof, defense counsel summarized the evidence that she desired to elicit from Vickie Macon, defendant's mother. Macon would testify that the day of the incident, as she was going to work, an officer arrived at her home to ascertain whether she was safe. Defendant had apparently contacted them to check on her safety. While the officer was still there, defendant called and advised her that he was having issues with a drug cartel and its members intended to hurt her. Macon assured defendant that she was not afraid and did not have any issues with the cartel. Macon would testify that defendant went to the hospital to protect her and not to harm her. Additionally, defendant was moving to a different location, but his U-Haul was filled with rocks rather than his belongings.

The prosecutor objected to the evidence as irrelevant because the charged crimes were general intent crimes and defendant's mental state was not relevant. He also objected to Macon testifying as to her belief concerning defendant's mental state. Additionally, the prosecutor argued that evidence as to defendant's mental state would be unduly prejudicial pursuant to Evidence Code section 352.

Defense counsel argued that the evidence was admissible as to defendant's motive, even though the offenses were general intent crimes and relevant as to defendant's general intent.

The court found that the circumstances surrounding the welfare check were not relevant, as the crimes involved only general intent, and evidence that defendant had filled his U-Haul with rocks and had a substance abuse problem would prove only that he had mental issues. The court similarly concluded that testimony as to defendant's motive

18.

to protect his mother was only relevant to defendant's mental state. The trial court permitted testimony as to defendant's character but precluded testimony from defendant's mother that defendant acted as he did to protect her.

## B. Standard of Review and Applicable Law

"Subject to certain limitations inapplicable to the present discussion, all relevant evidence is admissible." (*People v. Williams* (2008) 43 Cal.4th 584, 633, citing Evid. Code, § 351; see also Cal. Const., art. I, § 28, subd. (d).) Relevant evidence is defined as evidence " 'having any tendency in reason to prove or disprove any disputed fact that is of consequence to the determination of the action.' " (*People v. Williams*, at p. 633, quoting Evid. Code, § 210.) Evidence is relevant if it tends " ' "logically, naturally, and by reasonable inference" ' " to establish material facts. (*People v. Williams*, at p. 633.)

## C. Relevancy Analysis—Assault with a Semiautomatic Firearm

### 1. Applicable law

Section 240 defines "assault" as "an unlawful attempt, coupled with a present ability, to commit a violent injury on the person of another." Section 245, subdivision (b) prohibits individuals from assaulting another person with a semiautomatic firearm.

Assault requires "the general intent to willfully commit an act the direct, natural and probable consequences of which if successfully completed would be the injury to another." (*People v. Rocha* (1971) 3 Cal.3d 893, 899.) "The pivotal question is whether the defendant intended to commit an act likely to result in such physical force, not whether he or she intended a specific harm." (*People v. Colantuono* (1994) 7 Cal.4th 206, 218 (*Colantuono*).) However, our Supreme Court later clarified that because assault does not punish merely reckless conduct, it necessarily incorporates the language of probability, i.e., direct, natural and probable consequences that should be distinguished from an objective mental state akin to negligence. (*People v. Williams* (2001) 26 Cal.4th 779, 787–788 (*Williams*), citing *Colantuono*, at p. 219.)

"[A] defendant guilty of assault must be aware of the facts that would lead a reasonable person to realize that a battery would directly, naturally and probably result from his conduct. He may not be convicted based on facts he did not know but should have known. He, however, need not be subjectively aware of the risk that a battery might occur." (*Williams, supra*, 26 Cal.4th at p. 788.) "For example, a defendant who honestly believes that his act was not likely to result in a battery is still guilty of assault if a reasonable person, viewing the facts known to defendant, would find that the act would directly, naturally and probably result in a battery." (*Id.* at p. 788, fn. 3.) "Accordingly, we hold that assault does not require a specific intent to cause injury or a subjective awareness of the risk that an injury might occur. Rather, assault only requires an intentional act and actual knowledge of those facts sufficient to establish that the act by its nature will probably and directly result in the application of physical force against another." (*Id.* at p. 790.)

"Unless excluded by statute, all relevant evidence is admissible. (Cal. Const., art. I, § 28, subd. (d); Evid. Code, § 351.) ' "Relevant evidence" means evidence, including evidence relevant to the credibility of a witness or hearsay declarant, having any tendency in reason to prove or disprove any disputed fact that is of consequence to the determination of the action.' (Evid. Code, § 210.) Relevant evidence includes not only evidence of the *ultimate* facts in dispute but also evidence of *intermediate* facts, that is, facts from which the ultimate fact may reasonably be inferred. [Citations.] 'An inference is a deduction of fact that may logically and reasonably be drawn from another fact or group of facts found or otherwise established in the action.' " (*People v. Rodriguez* (1999) 20 Cal.4th 1, 18–19 (*Rodriguez*).)

A trial court's ruling to admit or exclude evidence is reviewed for abuse of discretion and will be upheld unless the trial court "exercised its discretion in an arbitrary, capricious, or patently absurd manner that resulted in a manifest miscarriage of justice." (*Rodriguez, supra*, 20 Cal.4th at pp. 9–10.) We may uphold its ruling on any ground if

20.

correct in result. (*People v. Brown* (2004) 33 Cal.4th 892, 901 [when deciding challenge to admission or exclusion of evidence, appellate court examines the result, not the trial court's rationale].)

As explained below, we find no abuse of discretion in the trial court's rulings.

### 2. *Analysis*

Defendant argues that the trial court erred in excluding evidence that he believed his mother, who was working in the hospital, was in danger from drug cartel members.[12] While defense counsel described generally that defendant had expressed this belief to someone while in the hospital, as the People argue, the offer of proof did not indicate whether defendant made these statements before he was arrested. Statements made by a defendant postarrest are hearsay and are not admissible if offered by a defendant. (Compare Evid. Code, § 1241 [a statement is not inadmissible hearsay if it is offered to explain, qualify, or make understandable conduct of the declarant and was made while the declarant was engaged in that conduct] with Evid. Code, § 1220 [statements of a party when offered against the party not inadmissible hearsay].) There was no offer of proof indicating that defendant had made such statements to individuals during his crimes and before being arrested. Defendant has failed to demonstrate that the trial court erred.

Defendant offered his mother's testimony as to his statements to her earlier that day when explaining, after law enforcement responded to her residence, that cartel members intended to harm her. Statements of the declarant's then-existing state of mind, emotion, or physical sensation are not inadmissible hearsay if offered to prove the

---

[12] In making his arguments, defendant has relied upon facts set forth in an expert report that was not proffered to the court during either of the two hearings in which these issues were raised. We will not address the exclusion of specific evidence that was not actually proffered to the trial court when making its decision. (Cf. Evid. Code, § 354; *People v. Livaditis* (1992) 2 Cal.4th 759, 778; see *People v. Schmies* (1996) 44 Cal.App.4th 38, 53 [offer of proof must set forth actual evidence to be produced to support claim of erroneous exclusion of evidence].)

21.

declarant's state of mind, emotion, or physical sensation at any other time when it is an issue in the action.  (Evid. Code, § 1250, subd. (a)(1).)

Defendant argues that his motive is relevant to whether he committed assault with a firearm, even though the crime only requires proof of general intent to commit the act, and the trial court erred in excluding his earlier statements to his mother.  He also argues that his subjective intent to rescue his mother from cartel members who intended to harm her would tend to prove that he did not intend to discharge the assault rifle at the other individuals whom he encountered in the hospital and, therefore, such evidence was relevant to whether defendant intended to apply force to his victims.

While we agree that defendant's motive can be relevant as to whether he intended to commit the assaultive act, we ultimately conclude that the evidence of defendant's desire to protect his mother had little probative value in proving that he did not intend to shoot the loaded assault rifle, which he held "at the ready" as the barrel was facing the victims.

In an assault case, " '[t]he pivotal question is whether the defendant intended to commit an act likely to result in such physical force, not whether he or she intended a specific harm.' " (*Williams, supra*, 26 Cal.4th at p. 785.)  "As a result, a specific intent to injure is not an element of assault because the assaultive act, by its nature, subsumes such an intent." (*Id.* at p. 786.)  "[T]he nature of the defendant's *present willful conduct* alone suffices to establish the necessary mental state [for assault] without inquiry as to an intent to cause further consequences." (*Colantuono, supra*, 7 Cal.4th at p. 217.)  While testimony that a defendant did not intend to harm someone is not relevant because "intent to injure" is not an element of assault, evidence that defendant did not intend to shoot at the victim would be admissible evidence that defendant "did not commit a violent-injury-producing act necessary to establish an assault." (*Id.* at p. 217, fn. 8.)

"As [our Supreme Court] explained more than a century ago, 'Holding up a fist in a menacing manner, drawing a sword, or bayonet, presenting a gun at a person who is

within its range, have been held to constitute an assault. So, *any other similar act*, accompanied by such circumstances as denote an intention existing at the time, coupled with a present ability of *using actual violence* against the person of another, will be considered an assault.' " (*Colantuono, supra*, 7 Cal.4th at p. 219, quoting *People v. McMakin* (1857) 8 Cal. 547, 548 (*McMakin*).) However, "[t]his conclusion does not preclude a defendant charged with assault from presenting evidence that he or she did not intend to injure or do violence to the victim."[13] (*Colantuono,* at pp. 218–219, fn. 10, citing *McMakin*, at p. 549.) But "if the jury determines from the facts that the defendant willfully committed a violent act, i.e., engaged in conduct that would by its nature likely and directly result in a 'violent injury,' it can reasonably find from the totality of circumstances that all elements of the offense are satisfied, including the requisite mental state." (*Colantuono*, at p. 219, fn. 10, quoting *McMakin*, at pp. 548–549.)

Defendant argues that the trial court erred in determining evidence of defendant's delusion was irrelevant to the elements of assault with a firearm because it failed to consider evidence of the "surrounding circumstances," including defendant's motive, which provide circumstantial evidence as to whether defendant committed the acts forming the basis for the assault. In support of this argument, defendant relies upon *People v. Cruz-Partida* (2022) 79 Cal.App.5th 197 (*Cruz-Partida*).

Cruz-Partida argued on appeal that the evidence failed to show that he did an act that would naturally and probably result in the application of force, nor was he aware of facts that would lead a reasonable person to conclude that his actions would have had such an effect because he fired one shot at the ground and away from the victims. (*Cruz-Partida, supra*, 79 Cal.App.5th at p. 206.) After reviewing our Supreme Court's decision in *Williams, supra*, 26 Cal.4th 779, the court stated, "Cruz-Partida's assertions to the

---

[13] While *McMakin* addressed a defendant's intent to injure or do violence, our Supreme Court later clarified that *McMakin* is authority for the proposition that general intent is sufficient for assault. (*People v. Chance* (2008) 44 Cal.4th 1164, 1171, fn. 6.)

contrary notwithstanding, pointing a loaded gun at another individual and/or firing that gun in the vicinity of others has been found, under appropriate circumstances, to be sufficient to justify a charge of assault." (*Cruz-Partida*, at pp. 207–208.)

In support, *Cruz-Partida* examined "the oldest case touching on this issue," *McMakin, supra*, 8 Cal. 547. (*Cruz-Partida, supra*, 79 Cal.App.5th at p. 208.) McMakin threatened to shoot the victim, who was horseback riding on land both men claimed to own, and drew a revolver, "which he held in a perpendicular line with the body of [the victim], but with the instrument so pointed that the ball would strike the ground before it reached [the victim], had the pistol been discharged," and the victim turned his horse and rode off. (*McMakin*, at p. 547.) Noting that the ability to commit the offense was clear, the court stated, "As to what shall constitute evidence of such intention, is the question arising in this case." (*Id.* at p. 548.) "Holding up a fist in a menacing manner, drawing a sword or bayonet, presenting a gun at a person who is within its range, have been held to constitute an assault. So any other similar act, accompanied by such circumstances as denote an intention existing at the time, coupled with a present ability of using actual violence against the person of another, will be considered an assault." (*Ibid.*)

In discussing the evidence of intent necessary for an assault, our Supreme Court stated that "presenting a gun at a person who is within its range … accompanied by such circumstances as denote an intention existing at the time, coupled with a present ability of using actual violence against the person of another, will be considered an assault." (*McMakin, supra*, 8 Cal. at p. 548.) The *McMakin* court noted, "The drawing of a weapon is generally evidence of an intention to use it." (*Id.* at p. 549.) In that case, the evidence was sufficient, even though the gun was not pointed directly at the victim, because there was no evidence rebutting the intention to use it and McMakin threatened to shoot the victim if he did not leave. (*Id.* at p. 548.)

24.

*Cruz-Partida* reviewed several other cases[14] and "discern[ed] … the general rule that displaying a gun and/or firing it in the general direction of others is sufficient to provide the mens rea for an assault charge where there is animus between the defendant and the targeted party and/or the surrounding circumstances are fraught. Thus, understanding the context is important." (*Cruz-Partida, supra*, 79 Cal.App.5th at p. 210.) The court also noted, "We can also envision a scenario where a gun is displayed in a rude or angry manner, but other circumstances show that the armed individual has no intent to actually discharge it." (*Id.* at p. 211, fn. 14.) The court concluded that "Cruz-Partida's dangerous conduct in displaying and/or firing the gun, along with the bad blood between him and [the victims] and the other surrounding circumstances provide substantial evidence of the mens rea for assault, even though there is no evidence Cruz-Partida actually aimed at either [victim]." (*Ibid.*) A reasonable person, knowing what Cruz-Partida knew at the time, would find that the act of pointing the loaded gun in the general vicinity of the victims during the continuing dispute would directly, naturally, and probably result in some type of physical force being applied to one of the two brothers. (*Id.* at p. 211.)

---

[14] *Cruz-Partida, supra*, 79 Cal.App.5th at pages 208–210, quoting *People v. Hartsch* (2010) 49 Cal.4th 472, 507–508 (pointing a gun at the victim " 'under threatening circumstances' " was sufficient to establish the mental state for assault), *Williams, supra*, 26 Cal.4th at pages 782, 790 (Williams's firing of a " 'warning shot' " toward the victim's truck with knowledge the victim " 'was in the near vicinity' " sufficiently demonstrated " 'that his act by its nature would directly, naturally and probably result in a battery' ") and *People v. Laya* (1954) 123 Cal.App.2d 7, 12, 16 (" '[t]he mere pointing of a gun at a victim constitutes an assault with a deadly weapon, whether or not it is fired at all' ") and citing *People v. Raviart* (2001) 93 Cal.App.4th 258, 261–262, 264–267 (*Raviart*) (upholding two convictions of assault with a firearm on a police officer under *Williams* where the defendant pointed a loaded gun at one officer as he rounded the corner of a building while another officer crouched nearby around the corner; pointing the gun at one officer was sufficient to effect an assault upon both officers who were pursuing him).

25.

Therefore, we agree that evidence of the circumstances of the assault are generally relevant to the issue of whether defendant committed an act with a firearm that would result in the application of force to a person and whether he intended the application of force. In this case, the trial court excluded the evidence of defendant's belief that his mother was being targeted by cartel members as irrelevant to whether defendant had the general intent to discharge the firearm without addressing use of the evidence for these other purposes.[15] Nonetheless, we conclude that the trial court did not err because the proffered evidence lacked probative value to prove defendant did not intend to discharge his firearm when he pointed it at the hospital employees.

Defendant argues that his mother would testify that he had told her earlier in the day that cartel members intended to harm her. Admission of this evidence, therefore, would allow the jury to infer that he went to the hospital to protect her from the cartel members. From these facts, the jury could infer that he only intended to discharge his firearm at cartel members and, therefore, did not point the firearm at the hospital employees with the intent to discharge it at them.

"Relevant evidence includes not only evidence of the *ultimate* facts in dispute but also evidence of *intermediate* facts, that is, facts from which the ultimate fact may reasonably be inferred. [Citations.] 'An inference is a deduction of fact that may logically and reasonably be drawn from another fact or group of facts found or otherwise established in the action.' " (*Rodriguez, supra*, 20 Cal.4th at pp. 18–19.) Defendant's motive for entering the hospital with a firearm is characterized as an intermediate fact from which defendant wanted the jury to infer that by acting in conformity with that

---

**15** Defendant's voluntary intoxication is not admissible to negate his general intent to commit the charged crimes. (*People v. Whitfield* (1994) 7 Cal.4th 437, 448, superseded by statute as stated in *People v. Mendoza* (1998) 18 Cal.4th 1114, 1133; *People v. Hood* (1969) 1 Cal.3d 444, 455–459.) Similarly, defendant's diminished capacity is not a defense to general intent crimes. (*People v. Gauze* (1975) 15 Cal.3d 709, 718–719.)

belief, defendant would have no reason to harm the hospital employees and, therefore, defendant did not point and intend to discharge his firearm at them, which are facts of consequence to a determination of the action. (See *People v. Hill* (1992) 3 Cal.4th 959, 987, overruled on other grounds in *Price v. Superior Court* (2001) 25 Cal.4th 1046, 1069, fn. 13.)

Nonetheless, we cannot conclude that this evidence, " 'in the light of logic, reason, experience, or common sense, has, by reasonable inference, a tendency to prove or disprove' " defendant's general intent as to hospital employees. (See *People v. Hill, supra*, 3 Cal.4th at p. 988, overruled on other grounds in *Price v. Superior Court* (2001) 25 Cal.4th 1046, 1069, fn. 13.) If the jury believed that defendant was attempting to protect his mother, logic, reason, experience, or common sense would not have resulted in the reasonable inference that defendant would have limited his assaultive actions to cartel members. Defendant may not have been able to distinguish between cartel members and hospital employees. Alternatively, defendant may have intended to use force against the hospital employees if they interfered with his objective or he believed they would prevent him from finding his mother.

"The court must exclude irrelevant proffered evidence which [tends to] prove or disprove a disputed fact only if the trier of fact must draw speculative or conjectural inferences from it." (*People v. Parrison* (1982) 137 Cal.App.3d 529, 539, citing 1 Jefferson, Cal. Evidence Benchbook (2d ed. 1982) § 21.3, p. 502 [proffered evidence is not relevant if it tends to prove or disprove a fact of consequence to determination of the action only by resort to inferences or deductions from that evidence that are speculative or conjectural in nature].) The evidence of defendant's belief he needed to protect his mother would prove defendant's lack of general intent only by the conjectural and speculative inference that defendant did not intend to use force against the hospital employees in his efforts to protect his mother.

The trial court has broad discretion to decide whether evidence is relevant, and it had no duty to admit evidence which provides only speculative inferences regarding disputed issues in the case. (*People v. Babbitt* (1988) 45 Cal.3d 660, 681 [inference that defendant was triggered by violent movies about Vietnam playing on victim's television too speculative to permit evidence as to the movies].)

The trial court did not abuse its discretion in excluding the proffered evidence because it was not relevant to defendant's general intent or whether he pointed his firearm at the victims with the intent to discharge it.

### D. Relevancy Analysis—Shooting at an Occupied Building

#### 1. *Applicable law*

Section 246 provides in pertinent part: "Any person who shall maliciously and willfully discharge a firearm at an … occupied building … is guilty of a felony …." Section 246 is a general intent crime, and "[t]he elements of this offense are (1) acting willfully and maliciously, and (2) shooting at an inhabited house." (*People v. Ramirez* (2009) 45 Cal.4th 980, 985 & fn. 6.) The word "maliciously" imports "a wish to vex, annoy, or injure another person, or an intent to do a wrongful act, established either by proof or presumption of law." (§ 7, subd. (b)(4).) The word "willfully" implies "simply a purpose or willingness to commit the act" and does not require an intent to violate the law, injure another, or acquire an advantage. (*Id.*, subd. (b)(1).)

#### 2. *Analysis*

Defendant argues that the trial court abused its discretion in excluding evidence that he discharged his firearm at an occupied building out of fear for his mother because such evidence was relevant to whether he acted with malice, that is, without justification or excuse or mitigating circumstance. We reject defendant's argument that evidence of defendant's motive was a mitigating circumstance that would defeat the jury's finding that defendant acted maliciously.

Defendant relies upon our Supreme Court's decision in *In re V.V.* (2011) 51 Cal.4th 1020, which analyzed the statutory definition of malice[16] in rejecting V.V.'s argument that the malice element of arson required an intent to cause a fire, some other harm, or an "evil result." (*In re V.V.*, at p. 1028.) " ' "[M]alice … in its legal sense it means a wrongful act, done intentionally, without just cause or excuse." ' " (*Ibid.*, quoting *People v. Ah Toon* (1886) 68 Cal. 362, 362.) The court explained the two types of malice: (1) malice in fact—defined as a " 'wish to vex, annoy, or injure' " and consisting of actual ill will or intent to injure; and (2) malice in law—defined as the "intent to do a wrongful act, established either by proof or presumption of law." (*In re V.V.*, at p. 1028, quoting § 7, subd. (b)(4).) The court then explained that malice in law "may be 'presumed' or 'implied' from the intentional doing of the act without justification or excuse or mitigating circumstance." (*In re V.V.*, at p. 1028, citing *Davis v. Hearst* (1911) 160 Cal. 143, 149 (*Davis*) [a civil action to recover damages for libelous matters published in a newspaper].)

This definition of malice also appears in Perkins, Criminal Law (2d ed. 1969) page 769 (Perkins), relied upon by defendant.[17] Ultimately, however, *In re V.V.* held, "In determining whether the second type of malice ('intent to do a wrongful act') is established for arson, malice will be presumed or implied from the deliberate and intentional ignition or act of setting a fire without legal justification, excuse, or claim of right," but did not use the term "mitigating circumstances." (*In re V.V., supra*, 51 Cal.4th at p. 1028.)

---

[16] The arson statute (§ 450) includes its own definition of "maliciously," which is nearly identical to section 7, except it also includes "defraud." (Compare § 450, subd. (e) with § 7, subd. (b)(4).)

[17] (See also Perkins & Boyce, Criminal Law (3d ed. 1982) Other Particular States of Mind, § 4, pp. 858–859.)

The terms "justification," "excuse," and "mitigation" (or "mitigating circumstances") are legal concepts that describe different categories of affirmative defenses to a crime and those circumstances that reduce the degree of the crime or its punishment.[18]  (See 1 Witkin, Cal. Criminal Law (5th ed. 2024) Affirmative Defenses, § 2, p. 410; *People v. Saille* (1991) 54 Cal.3d 1103, 1115 [For purposes of murder, express "malice" is defined as a deliberate intention to unlawfully take a life, and " '[t]he adverb "unlawfully" … means simply that there is no justification, excuse, or mitigation for the killing recognized at law.' "]; *Jackson v. Superior Court* (1965) 62 Cal.2d 521, 525 [malice is presumed without evidence of excuse, justification, or mitigation].)  " 'The adverb "unlawfully" in the express malice definition means simply that there is no justification, excuse, or mitigation for the killing *recognized by the law*.' "  (*Saille*, at p. 1115, italics added; see also Perkins, *supra*, at p. 769 ["[i]n brief, malice in the legal sense imports … the absence of all elements of justification, excuse or *recognized mitigation*" (boldface omitted & italics added)].)

Defendant argues, however, that because our Supreme Court in *In re V.V.* used the term "mitigating circumstances" in discussing the definition of malice, there must be mitigating circumstances applicable to the crime of shooting at an occupied building, and he identifies his motive in protecting his mother as one such circumstance.[19]  First, we

[18] "Justification" refers to a sufficient reason explaining why one acted in a way that, without the reason, constitutes an offense, including consent, self-defense, defense of others, defense of property, and necessity.  (Black's Law Dict. (12th ed. 2024) p. 1034, col. 2.)  "Excuse" refers to a defense that relieves defendant of blame such as duress, entrapment, insanity, and involuntary intoxication.  (*Id.* at p. 711, col. 1)  "Mitigating circumstances" are facts that do not justify or excuse an offense but reduce the degree of culpability or punishment.  (*Id.* at p. 307, col. 1.)

[19] The court instructed the jury pursuant to CALCRIM No. 965:  "Someone acts maliciously when he or she intentionally does a wrongful act or when he or she acts with the unlawful intent to disturb, annoy, or injure someone else."  In a footnote, defendant argues that the jury instruction failed to correctly define malice because it did not include the language that he committed the wrongful act without "justification, excuse, or

note that *In re V.V.* did not ultimately include "mitigating circumstances" in the definition of malice for purposes of arson after concluding the discussion of malice's historical development and legal meaning. (*In re V.V., supra*, 51 Cal.4th at pp. 1028–1029.) Malice has different meanings depending upon the crime to which it is attached. (Perkins, *supra*, at p. 769.)

Second, the term "mitigating circumstance" is used in *In re V.V.* while reviewing the historical meaning of malice and attributed to *Davis*. (*In re V.V., supra*, 51 Cal.4th at p. 1028 ["the intentional doing of the act without justification or excuse or mitigating circumstances"], citing *Davis, supra*, 160 Cal. at p. 158.) Apart from *In re V.V.* not using the terms "mitigating circumstance" in the final definition of malice, *Davis* was a civil libel case that, in part, concluded that malice in fact was a state of mind arising from ill will and evidencing an intent to vex, annoy, or injure (as in § 7) and only malice in fact justified an award of punitive damages. (*Davis*, at pp. 160–161, 163.) The term "circumstances in mitigation" in a civil libel case functions to either disprove the existence of malice in fact or lessen compensatory damages by rebutting evidence of special damages or bad reputation. (*Id.* at p. 175.) A defendant most often would not plead truth as a complete defense but would respond with proof of circumstances which would mitigate damages. (*Id.* at p. 188.) More importantly, *Davis*, in addressing the term "malice," specifically noted that the civil law of libel uses different definitions and has different defenses from the criminal law of libel. (*Id.* at p. 154.)

We do not conclude that the *In re V.V.* court's passing references to "mitigating circumstance," without additional elaboration, grafted the legal concept of "mitigating circumstances" from civil liable law into the section 7 definition of malice. Other than liable, the term "mitigating circumstances" is also used to describe those substantial

mitigating circumstances." However, CALCRIM No. 965 correctly defines malice in accordance with section 7, subdivision (b)(4), which requires proof that defendant committed the wrongful act intentionally.

31.

circumstances in mitigation that will reduce a killing that would otherwise be murder to voluntary manslaughter, such as an unreasonable belief in the need for self-defense, or provocation.  (Perkins & Boyce, Criminal Law (3d ed. 1982) § 1, p. 75; see § 190.3 [in determining whether to impose the death penalty or life without the possibility of parole, "the trier of fact shall consider, take into account and be guided by the aggravating and mitigating circumstances referred to in this section"].)  This concept is not applicable to section 7, subdivision (b)(4)'s definition of malice.  Defendant even acknowledges that "[n]o case has set forth what factors mitigate a defendant's culpability for firing at an occupied building."

Defendant argues that failure to recognize "mitigating circumstances" as part of the definition of "malice" in section 246 reduces it to surplusage.  Previously, however, our Supreme Court explained the malice requirement in arson ensures that the act is " 'done with a design to do an intentional wrongful act … without any legal justification, excuse or claim of right,' " and the "willful and malice requirement ensures that" it is "a deliberate and intentional act, as distinguished from an accidental or unintentional … act."  (*People v. Atkins* (2001) 25 Cal.4th 76, 88.)  It has this meaning regardless of whether malice's definition includes any mitigating circumstances and is not included in arson's definition of malice.  Additionally, since we do not agree that the concept of "mitigating circumstances" is applicable to section 7's definition of malice, defendant's argument necessarily fails.

Defendant argues that section 246 punishes those who fire at an occupied building with a "person-endangering-by-shooting state of mind," but this not a correct statement of the intent required for section 246.  In *People v. Ramirez, supra*, 45 Cal.4th 980, our Supreme Court held that section 246 is a general intent crime such that an individual need not intend to endanger any person when shooting.  (*Ramirez*, at p. 985 & fn. 6.)

We conclude the trial court did not abuse its discretion in excluding the proffered evidence because it was not relevant to defendant's general intent or whether he discharged his automatic firearm at a hospital occupied by other individuals.

### E.    Evidence Code section 352 analysis

#### 1.    *Applicable law and standard of review*

In excluding the evidence, the trial court held, "I believe [considering what or why defendant shot up the hospital] would also confuse and possibly have the jury get bogged down in mental aspects that are not relevant to these charges." The trial court has broad discretion in determining whether evidence is relevant. (*People v. Williams, supra*, 43 Cal.4th at p. 634.) Even if the evidence is relevant, the trial court has the discretion to exclude it under Evidence Code section 352, which provides: "The court in its discretion may exclude evidence if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury." A trial court's discretionary evidentiary ruling under this statute " ' "must not be disturbed on appeal except on a showing that the court exercised its discretion in an arbitrary, capricious or patently absurd manner that resulted in a manifest miscarriage of justice." ' " (*People v. Williams*, at pp. 634–635.)

#### 2.    *Analysis*

We agree with the People that the trial court correctly recognized that because both assault with a semiautomatic firearm and shooting at an occupied building are general intent crimes, evidence of defendant's delusion would confuse the jury as to use of the evidence in light of the elements of the offenses. To be guilty of assault, a defendant "need not be subjectively aware of the risk that a battery might occur." (*Williams, supra*, 26 Cal.4th at p. 788.) "[A] defendant who honestly believes that [their] act was not likely to result in a battery is still guilty of assault if a reasonable person, viewing the facts

known to [the] defendant, would find that the act would directly, naturally and probably result in a battery." (*Ibid.* at fn. 3.)

We previously concluded that the testimony of defendant's mother, that he believed his actions were necessary to protect her, had little or no probative value to prove defendant did not intend to discharge his firearm at the individuals he encountered in the hospital. Given that such evidence would have little relevance to defendant's general intent to commit the crime, the trial court correctly recognized the likelihood that the jury would use defendant's mental state and need to protect his mother to conclude that defendant did not intend to hurt anyone, as opposed to whether he intended an act that would result in the use of force. Furthermore, the jury could have confused defendant's intent to protect his mother and intent to commit acts likely to result in a battery on other individuals.

We find no abuse of discretion in the court's decision to exclude this testimony.

### III. *Defendant's convictions of assault with a semiautomatic weapon as charged in counts nine and ten are supported by sufficient evidence.*

Defendant argues that his convictions for assaulting Cunanan and Oxford (counts nine & ten) are not supported by substantial evidence that he willfully carried out an act with a firearm that would directly and probably result in the application of force as to Oxford and Cunanan. We disagree.

#### A. **Standard of Review and Applicable Law**

In reviewing the sufficiency of evidence to support a conviction, we examine the entire record and draw all reasonable inferences therefrom in favor of the judgment to determine whether it discloses substantial credible evidence from which a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt. (*People v. Brooks* (2017) 3 Cal.5th 1, 57.) We do not redetermine the weight of the evidence or the credibility of witnesses. (*People v. Albillar* (2010) 51 Cal.4th 47, 60; see *People v. Young* (2005) 34 Cal.4th 1149, 1181 ["Resolution of conflicts and inconsistencies in the

34.

testimony is the exclusive province of the trier of fact."].) We must accept logical inferences that the trier of fact might have drawn from the evidence even if we would have concluded otherwise. (*People v. Streeter* (2012) 54 Cal.4th 205, 241, overruled on other grounds as stated in *People v. Harris* (2013) 57 Cal.4th 804, 834.) "If the circumstances reasonably justify the trier of fact's findings, reversal of the judgment is not warranted simply because the circumstances might also reasonably be reconciled with a contrary finding." (*Albillar*, at p. 60.) If more than one inference may reasonably be drawn from the evidence, we accept the inference supporting the judgment. (*People v. Manibusan* (2013) 58 Cal.4th 40, 87.)

The reviewing court need not address "assertions of conflicts in the evidence" or "alternative theories regarding the inferences that should have been drawn from the evidence." (*People v. Letner and Tobin* (2010) 50 Cal.4th 99, 162.) "A reversal for insufficient evidence 'is unwarranted unless it appears "that upon no hypothesis whatever is there sufficient substantial evidence to support" ' the jury's verdict." (*People v. Zamudio* (2008) 43 Cal.4th 327, 357; accord, *People v. Manibusan, supra*, 58 Cal.4th at p. 87.)

For this offense, the People must prove that (1) "defendant did an act with a deadly weapon that by its nature would directly and probably result in the application of force to a person"; (2) "[d]efendant did the act willfully"; (3) "[w]hen defendant acted, he was aware of facts that would lead a reasonable person to realize that his act by its nature would directly and probably result in the application of force to someone"; and (4) "[w]hen defendant acted, he had the present ability to apply force likely to produce great bodily injury or with a deadly weapon." (*People v. Golde* (2008) 163 Cal.App.4th 101, 121.)

" '[T]he test for assault is whether a reasonable person, viewing the facts known to [the defendant], would find that the act in question would directly, naturally, and probably result in physical force being applied to another, i.e., a battery.' [Citation.] No specific

intent to cause injury is required. [Citation.] Rather, the focus is on the 'offensive or dangerous character of the defendant's conduct.' [Citations.] [A defendant's] assertions to the contrary notwithstanding, pointing a loaded gun at another individual and/or firing that gun in the vicinity of others has been found, under appropriate circumstances, to be sufficient to justify a charge of assault." (*Cruz-Partida, supra*, 79 Cal.App.5th at pp. 207–208, second bracketed insertion in original.)

## B. Analysis

As discussed above, there is well-established precedent that a defendant commits assault by pointing a gun at a person. "[P]resenting a gun at a person … [has] been held to constitute an assault." (*McMakin, supra*, 8 Cal. at p. 548.) "The mere pointing of a gun at a victim constitutes an assault with a deadly weapon, whether or not it is fired at all." (*People v. Laya, supra*, 123 Cal.App.2d at p. 16.) "[I]t is not necessary to actually point the gun directly at the other person to commit the crime." (*Raviart, supra*, 93 Cal.App.4th at p. 263.) Where a gun is pointed in the general direction of a victim, a conviction may be sustained where the gun "was in a position to be used instantly." (*People v. Thompson* (1949) 93 Cal.App.2d 780, 782.) "The drawing of a weapon is generally evidence of an intention to use it," unless "rebutted when the act is accompanied with a declaration, or circumstances, showing no intention to use it." (*McMakin*, at p. 549; see *People v. Miceli* (2002) 104 Cal.App.4th 256, 269 ["To point a loaded gun in a threatening manner at another … constitutes an assault, because one who does so has the present ability to inflict a violent injury on the other and the act by its nature will probably and directly result in such injury."].)

Cunanan and Oxford both testified that they saw defendant in the hallway holding the firearm in front of him, parallel to the ground, at waist level and with one hand on the stock and one hand on the grip. The jury could infer from this description that defendant's grip on the firearm enabled him to be ready to fire if necessary. When he turned to face them, the firearm was directed at them, and defendant made eye contact

with Oxford who was standing with Cunanan. The women retreated back into their office and heard defendant pacing outside the door behind which they were barricaded. Both women testified that based on the encounter, they believed that defendant intended to shoot them.

Defendant argues that the evidence is insufficient to prove that defendant "willfully took an action" when he pointed the firearm because Cunanan testified that defendant was looking around the hallway and did not seem to know where he was going. Defendant argues that this is evidence that he may not have been specifically turning to target them for violence. However, Cunanan testified that defendant was looking around before he saw her, then turned to her and Oxford and made eye contact with Oxford. The court in *Cruz-Partida* found that, although Cruz-Partida never aimed the gun directly at either victim, the evidence clearly established that Cruz-Partida pointed the gun in their general vicinity. (*Cruz-Partida, supra*, 79 Cal.App.5th at p. 211, fn. 13.) We also note that defendant followed them as they hid behind an office door, supporting Cunanan's and Oxford's beliefs that defendant intended to shoot them.

Other evidence supports the jury's conclusion that defendant intended to discharge the weapon based upon defendant's actions with other victims. For example, Russell reported to 911 that defendant had pointed a pistol at him when Russell asked defendant to leave the premises (after defendant advised that he was looking for his mother in the hospital) and threatened him by saying, "If I were you[,] I'd get out of here, unless you wanna go down too." The jury could have inferred that defendant's threat to shoot at Russell indicated his intent with reference to the other victims he encountered. Significantly, defendant had actually discharged the firearm at least three times and destroyed the hospital doors. Such violence indicates that defendant was prepared to discharge his firearm when encountering the other victims.

Most of the witnesses testified that defendant held the weapon with one hand holding the grip and the other stabilizing the stock. Although the direction of defendant's

body determined at whom the firearm pointed, the jury could have inferred defendant's intent to discharge the firearm by the fact that he held it ready to fire instantaneously as opposed to holding it at his side with one arm or hanging from the strap off his shoulder. Christophers testified that when he asked defendant to lower the weapon, defendant did not do so and responded that he did not intend to shoot anyone. However, Christophers told defendant that he did not believe it because defendant had already fired the weapon. Later, when encountering Hollenbaugh for the second time, the video shows that defendant pointed the weapon at him, and Hollenbaugh ducked behind the wall in response. While Hollenbaugh could not remember whether defendant intentionally pointed the firearm at him, the jury could have concluded that Hollenbaugh would not have taken cover when defendant pointed the weapon unless defendant's words or conduct indicated that he would discharge it. These actions further support the jury's findings that defendant intended an act that could have resulted in the application of force to Oxford and Cunanan when he directed that firearm at them.

Defendant further argues that because the entire encounter was only a few seconds, based upon the 911 call, there was not enough time for defendant to apply force to the women. The testimony supports a finding that defendant had enough time to turn the firearm on the women and follow them to the office door they hid behind. Cunanan testified that she was on the line with 911 while defendant was outside their door pacing, and she engaged in conversation with the operator until the operator notified her that defendant was in custody. Defendant cites no authority for the proposition that an assault requires any particular length of time, but we conclude that such an act can occur quickly, and often does.

Although defendant claims that there are various inferences that could be drawn from the evidence to support his defense, the issue is not what evidence or inferences may support defendant but whether substantial evidence supports the judgment.

Substantial evidence supports the jury's verdicts as to counts nine and ten. Defendant held a firearm and directed it to the victims, and therefore, he consequently had the present ability and intent to apply force. (See *People v. Miceli, supra*, 104 Cal.App.4th at p. 269.) Defendant pointed the firearm in the general direction of Cunanan and Oxford, and they were in the potential line of fire of the weapon. The gun did not have to be pointed directly at them. (*Raviart, supra*, 93 Cal.App.4th at p. 263.) It is sufficient that while pointing the weapon, it "was in a position to be used instantly." (*People v. Thompson, supra*, 93 Cal.App.2d at p. 782.) Defendant had "the present ability to inflict a violent injury on [them]." (*Miceli*, at p. 269.) His act "by its nature will probably and directly result in such injury." (*Ibid.*)

## DISPOSITION

The trial court's May 29, 2019 and January 16, 2020 orders denying defendant's motion for mental health diversion are reversed, and the judgment is conditionally reversed and remanded for reconsideration of defendant's motion under section 1001.36, as amended by Senate Bill 1223 (Stats. 2022, ch. 735, § 1, pp. 8169–8173). We express no view concerning whether defendant will be able to show eligibility on remand or whether the trial court should exercise its discretion to grant diversion if it finds him eligible. If the trial court finds that mental health diversion is appropriate in light of the amendments to section 1001.36, the court shall grant the motion and order diversion. If defendant successfully completes diversion, the court shall dismiss the criminal charges. However, if the court determines that mental health diversion is not appropriate, or if the court orders a program of diversion but defendant fails to complete it successfully, the court shall reinstate the judgment.

The trial court shall amend the November 10, 2022 sentencing minute order to reflect the sentence as to count eight was the lower term of three years. The trial court shall also amend the abstract of judgment to reflect the following: (1) in section 1, the description of the crime for count one is shooting at an occupied building; (2) in

section 1, the sentence imposed for count eight is the lower term; and (3) in section 9, court operations assessments of $360 (§ 1465.8) and criminal conviction assessments of $270 (Gov. Code, § 70373) were imposed.  The trial court shall forward the amended abstract of judgment to the Department of Corrections and Rehabilitation.

In all other respects, the judgment is affirmed.


DETJEN, Acting P. J.

WE CONCUR:


FRANSON, J.


FAIN, J.[†]

---

[†] Judge of the Fresno Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.